The judgment and both orders should be reversed.

Present — JENKS, HOOKER, RICH and MILLER, JJ.

Judgment and orders reversed and new trial granted, costs to abide the event.

---

JOHN M. BOWERS, as Receiver of the MERCANTILE CREDIT GUARANTEE COMPANY OF NEW YORK, Respondent, *v.* WILLIAM H. MALE, SIEGMUND J. BACH and Others, Appellants, Impleaded with JAMES W. HINCKLEY and JOHN FITZGERALD.

First Department, January 26, 1906.

Corporation — liability of directors of credit insurance corporation for investing funds of said corporation in worthless stock of another corporation — when receiver of such corporation not estopped by action of stockholders authorizing such investment.

Action by the receiver of an insolvent credit insurance company against its directors personally to recover sums alleged to have been wasted by the defendants in the purchase of the worthless stock of another corporation under the control of said corporation.

The facts, in brief, were as follows:

The credit insurance corporation doing a losing business became unable to report the surplus required by the statutes of other States to entitle it to do business in such States. In order to satisfy the requirements as to said surplus, a plan was devised to reduce the capital stock which in said States was treated as a liability and to create a surplus to be made up by the conversion of a portion of its capital into surplus through the retirement and cancellation of an equal amount of stock, and by the raising of a further sum in cash. This plan was sanctioned by the stockholders at a regular meeting, at which the formation of a corporation was authorized, to be called the "Reserve Company," with a capital through which the surplus of the credit insurance company should be increased. The purchase of stock of said Reserve Company was authorized but it was provided by the stockholders that stock so purchased should not appear as an asset. The said Reserve Company was formed, but it was found impossible to dispose of any of its stock in open market, and the only asset of said company was an agreement made between the credit insurance company and one Smith, by which the latter was to pay the former $50,000 for full-paid stock to be canceled on delivery and $50,000 balance in installments, in consideration of which payments the insurance company agreed to pay Smith or his assigns $1 for each $1,000 of insurance in force on its books at certain periods. The said agreement further provided that said Smith, or his assigns, was only entitled to such payment in proportion to the sums advanced by him, and that a failure on his part to advance the sums should only operate to forfeit his right to said payment. This contract was assigned by Smith to the Reserve Company. Smith became the owner of the entire stock of the Reserve Company on the assignment of the contract; and the Reserve Company agreed to hold Smith harmless from all liability to the insurance company, and thereafter said insurance company did release said Smith from liability on said contract. Smith thereupon reassigned the capital stock of the Reserve Company to said company in consideration of its agreement to hold him harmless.

As said transactions did not enable the insurance company to report a sufficient surplus to do business in other States, the defendant directors subscribed for and bought $30,000 worth of stock of the Reserve Company, borrowing the money to pay therefor. Thereafter the defendant directors authorized the purchase by the insurance company of the stock of the Reserve Company, which was carried out by the purchase of the stock held by the defendants. Other transactions of the same nature were carried out by the defendants as particularly set forth in the opinion.

*Held,* that the defendants were personally liable to the receiver of said insurance company for sums squandered in the purchase of said stock of said Reserve Company known by them to be worthless;

That said directors were not relieved from said personal liability by reason of the resolution of the stockholders of said insurance company authorizing the formation of said Reserve Company and the purchase of the stock thereof;

That said defendants were not relieved from personal liability by reason of a
   resolution of the stockholders of said insurance company ratifying the acts of
   said directors in purchasing said stock when said directors had control of said
   meeting by controlling the majority of the stock in person or by proxy.
HOUGHTON, J., dissented.

SEPARATE APPEALS by the defendant William H. Male and by
the defendants Siegmund J. Bach and others from a judgment of
the Supreme Court in favor of the plaintiff and against the said
defendants, entered in the office of the clerk of the county of New
York on the 14th day of January, 1904, upon the report of a
referee, as amended by an order entered in said clerk's office on the
9th day of May, 1904, with notice of an intention on the part of
the defendant William H. Male to bring up for review upon such
appeal an order entered in said clerk's office on the 16th day of
December, 1904, granting the plaintiff an extra allowance.

By the judgment appealed from the complaint was dismissed as
to the defendants Hinckley and Fitzgerald, and from that portion
of the judgment the appellants other than William H. Male do not
appeal.

*William J. Curtis,* for the appellant Male.

*Charles A. Collin,* for the appellants Bach and others.

*George Zabriskie,* for the respondent.

Judgment affirmed, with costs, on the opinion of the referee;
HOUGHTON, J., dissenting.

The following is the opinion of the referee :

ODELL, Referee ;

The plaintiff sues as receiver of the Mercantile Credit Guarantee
Company of New York. The defendants were directors of that
company, and in the complaint they are charged with having, on or
about the 27th of October, 1896, misapplied and wasted $30,000 of
the funds of the company in the purchase of 300 shares of
the worthless stock of a corporation known as the Reserve Com-
pany, to the damage of the first-named company, its stockholders
and creditors. In some respects the case is a peculiar one, and a
statement of the facts at some length is necessary to an understand-

ing of the claim that is made and the grounds on which the defendants deny their liability.

The Mercantile Credit Guarantee Company was a New York corporation, organized in December, 1892, as a credit insurance company, or (as the president puts it) "a protection to a merchant against excessive and unlooked-for losses." It had a capital of $250,000, all of which was paid in in cash within two years from its creation. It did business in other States than New York, and at the close of the year 1894 it had risks outstanding amounting to $5,134,084, the premiums on which had amounted to $165,450.64. By the authorities of Ohio the company was ranked as an insurance company, and was, therefore, required, as a condition of doing business in that State, to comply with the requirements of the Ohio Insurance Law and maintain a surplus or "reserve" equal to fifty per cent of the premiums for insurance in force at the end of each year when it made its annual report. Substantially the same demand was made by the authorities of other States. The Mercantile Company was not able to exhibit the required surplus at the close of 1894. The year had been a disastrous one. The company had paid losses amounting to upwards of $166,000, and its surplus, as reported to the directors on January 10, 1895, was only $10,834.07. The situation was a serious one, and the stockholders were called together on December 5, 1894, "to consider such matters as will be presented for their action," including a proposed reduction of the capital stock and a proposed increase of the company's surplus. At that meeting a plan was approved and adopted which provided for the following: *First.* The formation of a company to be called the "Reserve Company," with a cash capital of $100,000, through or by means of which the surplus of the Mercantile Company should be increased by that amount. *Second.* The exchange by stockholders of the Mercantile Company of 500 shares, par value $50,000, of its stock for 500 shares, par value $50,000, of the stock of the Reserve Company. *Third.* The reduction of the capital stock of the Mercantile Company by 500 shares, the $50,000 represented by said shares to "constitute a surplus applicable to the liabilities" of the company. *Fourth.* The acquisition by the Mercantile Company, through a contract with the Reserve Company, or other party, of the 500 shares of Mercantile Company's stock received by the Reserve Com-

pany in exchange for its own stock, and the cancellation of said shares, whereby the proposed reduction of the capital stock of the Mercantile Company would be accomplished. *Fifth.* A contract between the Mercantile Company and the Reserve Company or other parties " for the purpose of establishing a surplus fund for said (the Mercantile) company of one hundred thousand dollars on such terms as by the board of directors may be determined to be for best interests of this company." At the same meeting a resolution was adopted by which the board of directors were " authorized and instructed at their pleasure and whenever they deem it to be to the interest of the company to do so, to purchase or buy from any source obtainable stock of the Reserve Company of New York, at a price not above the par value of said stock, and the money used in the purchase of said stock shall be deducted from the reserve or surplus of this company over and above its capital, \* \* \* and the stock so purchased shall not appear as an asset of the company." To this resolution the defendants appeal as a justification or partial justification of their action in making the purchase of stock alleged in the complaint.

' Following this stockholders' meeting, and on the twenty-eighth of December, the " Reserve Company " was created, with a share capital of $100,000, for the single purpose of furnishing the Mercantile Company with a reserve or surplus. It was organized by the Mercantile Company and was entirely under its control. On the 31st of December, 1894, an agreement was made between the Mercantile Company and William Bro Smith by which Smith agreed to pay to the company $50,000 of its full paid stock (such stock to be canceled on delivery) and the sum of $50,000 in cash in instalments on March first, July first and October first. In consideration of these payments the company agreed to pay to Smith or his assigns " the sum of one dollar for each one thousand dollars of insurance in force on the books of the said The Mercantile Credit Guarantee Company at its home office in New York on the first day of January, One thousand eight hundred and ninety-five, and on each succeeding first day of January during the continuance of this contract, such payments to be made in equal monthly instalments on the first day of each month in the year next succeeding the first day of January on which they are figured." Among other

First Department, January, 1906.        [Vol. 111.

provisions and stipulations of the said agreement was the following: "It is further mutually agreed that the said William Bro Smith, his executors, administrators or assigns, shall only be entitled to the proportion of the said one dollar per thousand hereinbefore specified to be paid as the amount paid shall bear to the said sum of one hundred thousand dollars, until the said one hundred thousand dollars shall be fully paid as hereinbefore specified, and a failure on the part of the said William Bro Smith, his executors, administrators or assigns, to pay said one hundred thousand dollars at the time and in the manner hereinbefore specified shall only operate to forfeit the right to said payment in said proportion." On the 10th of January, 1895, this agreement was assigned by Smith to the Reserve Company in consideration of the issuance to him of that company's entire capital stock, the Reserve Company undertaking to hold him harmless from all liability under or upon the said agreement and to procure for him from the Mercantile Company a full release from such liability. On the same day the Mercantile Company, by a written instrument, to which the Reserve Company and Smith were parties, did fully release Smith from such liability and accept the Reserve Company as the contracting party in his stead. Thereupon Smith transferred to the Reserve Company the whole of the stock which had been issued to him as the consideration for the assignment of the said agreement. On or about the twenty-eighth of January the stockholders of the Mercantile Company delivered to the Reserve Company twenty per cent (amounting to 500 shares) of their holdings of stock of the Mercantile Company and received therefor an equal number of shares of stock of the Reserve Company. The said 500 shares were then surrendered to the Mercantile Company in partial performance of the Smith agreement and were canceled. The results of these several transactions were that the stock of the Mercantile Company was reduced to $200,000, its surplus or reserve was increased by $50,000, and each of its stockholders became a stockholder of the Reserve Company.

The Mercantile Company was not yet in a condition to report a reserve sufficient to satisfy the requirements of Ohio and other States. The time to get together such a reserve was extended by Ohio and Illinois to July tenth. The Smith agreement provided

for the payment of $17,000 on March first and of a like sum on July first. These payments had been assumed by the Reserve Company, but on July ninth neither had been made — the Reserve Company not having been able to dispose of any of its stock, except a single share, and so being utterly without means to further perform the said agreement. In this emergency the defendants Male, Deen, Bach, Herzig and Smith, who were stockholders and directors of the Mercantile Company and members of its executive committee, came to the company's rescue. They subscribed for or purchased at par 300 shares ($30,000) of the stock of the Reserve Company and paid therefor with money borrowed for the purpose from the Phenix Bank. This sum was at once paid over to the Mercantile Company on account of the Bro Smith agreement, and made up the required reserve. No certificates were issued by the Reserve Company for the said 300 shares until about the ninth of September, and the $30,000 was deposited in the Phenix Bank, and a certificate of deposit was given therefor to the Mercantile Company "Payable on the return of this certificate to the order of the officers of said company duly approved by three" of the five purchasers of said stock.

Satisfactory reports, showing the required reserve, having been made in Ohio and other States, action was taken by the directors of the Mercantile Company to relieve the five parties named above from the liability incurred by them in the purchase of the said 300 shares. On the 1st of August, 1895, at a directors' meeting at which Deen, Male, Herzig, Smith, Berry and Fitzgerald were present, a resolution was adopted authorizing and directing the officers of the company to purchase at a price not above par $5,000 of the stock of the Reserve Company "in accordance with the authority and instructions given by the stockholders at their meeting of December 5th, 1894." At a meeting held on September fifth, at which Deen, Male, Bach, Smith, Fitzgerald and Berry were present, a similar resolution was adopted authorizing the purchase of $10,000 of the said stock. At a meeting held on October third, at which Deen, Male, Herzig, Smith, Fitzgerald and Berry were present, a similar resolution was adopted authorizing the purchase of $15,000 of the said stock. Purchases of Reserve Company stock were made pursuant to the said resolutions, and the stock purchased was the 300 shares subscribed for by Deen and his four associates.

At the close of the year 1895 the Mercantile Company found itself in the same condition as at the close of the preceding year, that is, unable to report a sufficient surplus to the States in the west. It had the 300 shares of Reserve stock, but at their meeting of December 5, 1894, the stockholders had, for a reason not explained, declared that any of that stock that might be purchased by the directors should "not appear as an asset of the company;" hence it was not available in computing a surplus. Therefore a sale of the stock was resorted to. The same five gentlemen who had subscribed for it in July now purchased it from the Mercantile Company, again borrowing the necessary moneys from the Phenix Bank, and the $30,000 paid for it was, on December thirtieth, deposited in bank as before by the Mercantile Company, and a certificate of deposit was issued by the bank payable to the order of the company "approved by either three of the executive committee," which consisted of the five purchasers and the defendant Hinckley. Reports, showing a fifty per cent. premium reserve, were then made to Ohio and other States. In completion of the transaction the 300 shares, which seem to have then stood in the name of C. Vincent Smith, treasurer, were assigned to the several purchasers — to Male 100, and to Deen, Bach, Herzig and Smith 50 each — and certificates were issued to them therefor.

On February 5, 1896, a meeting of the directors was held, at which Deen, Bach, Herzig, Berry and Smith were present, and a resolution was presented authorizing the officers of the company to purchase at a price not above par $30,000 of the stock of the Reserve Company, "in accordance with the authority and instructions given by the stockholders at their meeting of December 5th, 1894." The record does not show what action, if any, was taken by the board, but all parties have assumed that the resolution was duly adopted. What was done in execution of it is the reason for this action.

It is alleged in the complaint that the 300 shares were purchased by or for the Mercantile Company on the twenty-seventh of October. My conclusion is, after a careful study of the confused, contradictory and impossible testimony relating to the transaction that the purchase was in fact made about the third of March. On that day, according to the books of the Mercantile Company, the com-

pany loaned to the defendant Berry the sum of $30,000, taking his note therefor payable on demand with five per cent interest, and as collateral 300 shares of Reserve Company stock. Berry was the brother-in-law of Mr. Deen, the president of both companies. He was in no business, and he testified that his "means" at the time referred to did not amount to $5,000. When called as a witness by the plaintiff he admitted his signature to the note and his indorsement on the company's check, but could not tell what was done with the money nor where the collateral came from, nor whether the loan had been paid nor any other fact or incident connected with the transaction. Later in the case, when examined by his own counsel, he testified that he "made a loan from the company, or they took my note and I took the stock — three hundred shares;" that he bought the stock from the Mercantile Company; that he "wanted the stock and bought it;" that he did not purchase it from the company, but from Deen, Male, Bach, Herzig and Smith; that he paid no consideration for it; that it was transferred to him without consideration, and that he turned it over to the Mercantile Company. He also testified that he gave up the check for $30,000 to one of the officers of the company, and that he, personally, "never got a' dollar" of it. This portion of his testimony is true, for the proofs show that what happened was as follows: On the 3d of March, 1896, the certificate of deposit for $30,000, dated December 30, 1895, was returned to the Phenix Bank, approved by Herzig, Male and Bach, three of the executive committee named in it, and the Mercantile Company was credited with that sum in its account. On the same day the Mercantile Company made its check on the Phenix Bank to the order of Berry. It was indorsed by him in blank and delivered to the company, and was used on that day to pay off the loans made by the bank to Deen and his associates, with which they purchased the 300 shares from the company on December 30, 1895. On the following day (March fourth) the executive committee held a meeting — Bach, Male, Herzig, Deen and Smith being present, and the minutes show as follows: "It was moved, seconded and carried that a demand loan be made to Oliver F. Berry of $30,000, secured by stock of the Reserve Company." The transfers of the 300 shares by these five gentlemen to Berry are dated the twenty-sixth of March. The testimony of Mr. Deen is that the 300

shares were "practically purchased" by the Mercantile Company in March; that Berry never applied to the company for a loan; that he made the loan and gave the note at his (Deen's) request; that the purchase took the form of a loan rather than of an absolute purchase "solely for the convenience of the accounts of the company;" that it was carried as a loan in the name of Berry "for the convenience of keeping the matter alive on our books;" that Berry "was carried on our books as owing the company $30,000 for the sole purpose of keeping the transaction alive pending negotiations which we were having, increasing the capital stock or for the sale of the business to the Ocean or the other company;" that "it was the idea of myself that it was better to carry it that way than to thoroughly liquidate it through the books of the company," and that the check given to Berry "was cashed, and the proceeds were used to pay for the stock which was bought from the gentlemen by whom it was transferred to Mr. Berry to make the loan."

From the foregoing it plainly appears that the only parties benefited by the alleged loan were the parties who authorized it and who owned the stock which the money was "loaned" to purchase.

In the journal of the Mercantile Company, under date of October 27, 1896, appears the following entry: "Suspense Acct.— To Loan Acct.: For 300 shares Reserve Co. stock collateral to O. F. Berry's loan dated March 3, 1896. Purchased from him at par, $100 per share, in accordance with resolution of the Board of Directors adopted at meeting held Wednesday, February 5, 1896 — $30,000." There is no evidence showing nor, as I understand it, is it pretended by any party, that any purchase of this stock by the company from Berry was ever in fact made or was ever the subject of agreement or negotiation or consideration in any form between Berry and the company, or that Berry was in any manner informed that the company had assumed to take over the stock in satisfaction of his note. His testimony is that he had nothing to do with negotiating the loan; that he didn't know who paid it off; that he don't know how it was paid off; that he don't know when it was paid off he presumes it was paid because he "never heard anything from it." This goes to confirm what has been before said in substance — that Berry was a mere convenience, lending himself at the request of his brother-in-law, the president of the Mercantile Company, and

having no interest whatever in the transaction of the third of March, and that the real parties to that transaction were the five owners of the 300 shares of stock and the company whose money paid them for it at par.

The directors of the Mercantile Company met on the 5th of November, 1896. All of the defendants except Fitzgerald were present. " The president reported that in pursuance to a resolution of the board of directors of Feby. 5th, 1896, under authority given by the stockholders at their meeting of Dec. 5th, 1894, he had purchased 300 shares of the Reserve Company's stock at par. On motion, the action of the president in the purchase of this stock was and the same is hereby ratified and approved." The annual meeting of the stockholders of the company was held on February 4, 1897. Thirteen hundred and sixty-two of the 2,000 shares of stock were represented. The minutes show as follows : " It was moved, seconded and carried — Resolved, that all acts of the Board of Directors and its Executive Committee for the past year be approved and confirmed." In March or April, 1897, the Mercantile Company sold its business to the Ocean Accident and Guaranty Company, an English corporation, and went into liquidation. In August of the same year judgment dissolving the company and appointing the plaintiff receiver of its assets was entered in an action in this court brought by the People of the State.

It is urged by one of the learned counsel for the defendants that if, in March or October, 1896, these 300 shares of Reserve Company stock were worth $30,000 on the market, or were worth $30,000 to the Mercantile Company no matter what their market value may have been, or if the defendants, exercising a reasonable judgment, had reason to believe and did in good faith believe that the stock was in fact worth that sum, in either case the defendants cannot be charged with official wrongdoing and there can be no recovery in this action. The first suggestion is easily disposed of. The testimony of one of the defendants is that at no time had the stock any special market value, and there is nothing in the case tending to show the contrary.

The argument made in support of the second suggestion is, in substance, that by acquiring the stock the Mercantile Company relieved itself from the payment on it of a dividend of five per

cent per annum and possibly of a larger dividend. It has already been mentioned that the William Bro Smith agreement provided that in consideration of his paying to the Mercantile Company the sum of $100,000 in stock and cash, the company would pay to him or his assigns " the sum of One dollar for each One thousand dollars of insurance in force on the books of the said The Mercantile Credit Guarantee Company, at its home office in New York, on the first day of January, One thousand eight hundred and ninety-five, and on each succeeding first day of January during the continuance of this contract," and that, until the $100,000 should be fully paid the said Smith or his assigns should only be entitled to such proportion of said one dollar per thousand " as the amount paid shall bear to the said sum of " $100,000. The amount of insurance in force on the 1st day of January, 1895, was $5,134,084, which would insure a dividend on the issued stock of the Reserve Company of about five per cent. The amount of insurance in force on the 1st day of January, 1896, was $4,793,500, and on the 1st day of January, 1897, was only $4,096,500. The only asset the Reserve Company had was the Bro Smith contract. The only value its stock could possibly have was what it derived from the covenant of the Mercantile Company to pay the $1 on each $1,000 of insurance. The figures given above show that the business of the Mercantile Company was steadily decreasing. Its business for 1895 obligated it to pay less than five per cent, and for 1896 only four per cent on the Reserve Company stock. That stock was not a marketable stock; it could not be reckoned as an " asset " of the Mercantile Company; Mr. Male, one of the defendants, says that his opinion was that it was more advantageous to the company to have $30,000 in cash than the stock in its treasury. When asked, " In your judgment at that time (March 3, 1896), was the thirty thousand dollars worth of Reserve Company stock in the ownership of the Mercantile Credit Guarantee Company as valuable to it as thirty thousand dollars of cash ?" he answered, " In my judgment I should have preferred the cash;" and when asked, " Are you able to mention any advantage to the company in the repurchase of that stock ?" he answered, " No." No such advantage is disclosed by the testimony of any witness, and it is impossible to find as a fact upon all or any of the proofs in the case that the stock

was worth its par value to the Mercantile Company either in March or October, 1896.

What has been said answers in part the third suggestion, which is, that the defendants had reason to believe and did in good faith believe that the 300 shares were worth the amount paid for them by the Mercantile Company. By what facts in the case can such a belief be explained or defended? The defendants knew the exact condition of things. They knew how and for what purpose the Reserve Company had been organized; and what its capital stock represented; and that outside of the 500 shares which were exchanged for shares of the Mercantile Company and the 300 shares in question, only one share of its stock had been subscribed for or disposed of; and that the business of the Mercantile Company was on the decline; and that the real value of the Reserve stock was necessarily declining with it; and that at the very time the purchase of the 300 shares was authorized and made, negotiations were pending for the sale of the business of the Mercantile Company to another corporation. They, or some of them, testify that they expected that the Mercantile Company would continue in business, and that, with an increased capital and surplus, its business would be extended, whereby the Reserve Company stock would be made more productive; but such expectations are not to be taken into serious account in estimating the present value of a stock in respect to which they are indulged. They also testify that in March, 1896, their opinion was and they believed that the stock of the Reserve Company was worth par. My judgment is that the facts in evidence do not furnish any good or reasonable grounds for such a belief — and in calculating the weight to be given to such an opinion it must be remembered that the parties who testify, with two or three exceptions, are the parties who had the stock for sale, and whose action in selling it to a corporation of which they were trustees is a subject of inquiry in this case.

It is further strenuously insisted on the part of the defense that the $30,000 which the defendants are charged with having wasted never, in any true sense, formed part of the assets of the Mercantile Company, and that even if it did become part of the company's assets on the 30th of December, 1895, its disbursement on March 3, 1896, was not a waste, as the sale of the 300 shares by the company

on the former date, and the purchase of the same shares by the company on the latter date, constituted a single transaction and must be judged as an entirety; and that in its entirety it resulted in no loss to the company or profit to the directors. The very able argument of counsel in support of these propositions has not convinced me. He reaches his conclusion through a denial of the accuracy of some of the testimony of his client and of other of the defendants, and says they have called things by the wrong names. In explanation I refer briefly to a few of the undisputed facts. In July, 1895, five of the defendants paid the Reserve Company $30,000 for 300 shares of its stock, and that sum was paid by the Reserve Company to the Mercantile Company on account of the Bro Smith contract. In August, September and October the five sold the same shares to the Mercantile Company. In December the Mercantile Company sold the same shares to the same five gentlemen. In March, 1896, the five resold the same shares to the Mercantile Company. In each instance the purchase price was paid and there was an assignment or delivery of the shares. The defendants Herzig, Bach, Male, Smith and Deen, who were parties to these several transactions, speak of them as purchases and sales. Smith, one of the five who contributed in July and again in December to the fund of $30,000 which was used in the purchase of Reserve Company stock, says that on each occasion there was an "absolute purchase." Mr. Male says that the $30,000 paid by the five directors for the 300 shares in December, 1895, "became a part of the (company's) assets." He does not state this as an opinion, but as a fact. The proofs, in my judgment, establish the fact. To swell the company's assets was the very purpose for which that fund was raised. The situation of the company was such that, according to all the testimony, it had to have more assets, sufficient to largely increase its surplus or reserve, or retire from business in several States. The Reserve stock not being available as an asset, it was sold, that its proceeds might be added to the company's surplus, which was done. Mr. Deen says that the $30,000 was the "real, actual, absolute property" of the company in December, 1895, and in March, 1896, and that the money loaned to Berry in March was the company's money.

Counsel, however, claims that each of the purchases by the five

directors from the Mercantile Company of the Reserve Company stock was a purchase in form only, and was made with the understanding that when the object for which the purchase in form was made was accomplished, the Mercantile Company would return the money and take back the stock. The object referred to was to enable the company to report to the insurance departments in Ohio and other States that it had in hand the surplus which those States demanded. The testimony relating to this point is as follows: Mr. Herzig says "there was no stipulation about paying it (the money) back" on either occasion; that there was no agreement, but he relied upon getting his money back by means of the resolution of the stockholders of the company — referring to the resolution of December 5, 1894; that he relied on the stock being purchased from him "provided that the Mercantile Credit Guarantee Company did not need the money any further for the purpose of carrying it as a reserve." Mr. Male says that when he and his associates, in December, 1895, paid $30,000 to the Mercantile Company for the 300 shares he expected the Mercantile Company to buy back the stock; that there was no agreement, written or oral, on the part of the company to repurchase the stock, but "it was understood between us all;" that there was an understanding (meaning expectation, he says) in their own minds that $30,000 "tided them over this period and then it was to be repurchased." Mr. Bach says that there was no stipulation, express or implied, on the part of the Mercantile Company to take the Reserve stock off the hands of himself and his associates; that so far as he knew all there was on that subject was the resolution of the stockholders, and that on the strength of that resolution he contributed his share, "hoping to be relieved of that subscription." The stockholders' resolution of December 5, 1894, authorized the board of directors, whenever they should deem it to be to the interest of the company to do so, to buy with its surplus or reserve funds stock of the Reserve Company at a price not greater than par. Upon the testimony it may be safely assumed, I think, that the value of the Reserve stock was not a matter of consideration when it was purchased by the five associates in December, and that the "interest of the company" was not taken into account when it was sold by them to the company in March. The purchase was made by the five to relieve the company

First Department, January, 1906.                    [Vol. 111.

from an embarrassment and enable it to continue to do business in certain States; the sale was made to the company in order to reimburse the five the money they had expended, or relieve them from the liabilities they had incurred in making the purchase. The five purchasers were a majority of the company's directors; the power was in their hands, and it is highly probable that when, as individuals, they bought the 300 shares in December they intended to subsequently sit down as directors and authorize its purchase from themselves by the company. Four of them and Berry did authorize such purchase on the fifth of February; the five, as the executive committee, authorized the loan to Berry on the fourth of March, and, with Hinckley and Berry, approved and ratified the purchase at a directors' meeting on the fifth of November. I do not see how the sale by the company in December and the purchase of the company in March can properly be called parts of one transaction. When the company sold the stock and received the money the transaction on its part was completed. The purchasers were free to sell the stock in any market for any obtainable price to any party. It is conceded that there was no agreement or stipulation on the part of the company to buy it back. The only circumstance connecting the December transaction with the one in March was the knowledge or belief of the purchasers that under the stockholders' resolution, above referred to, they had the power as directors to take the stock off their own hands and transfer it to the company. Whether such a proceeding was discussed or considered by them the testimony does not disclose. Mr. Herzig relied "on getting the money back * * * by that resolution." Mr. Bach contributed on the strength of the resolution "hoping to be relieved of that subscription." Mr. Male says there was "an expectation in our own minds that it (the stock) was to be repurchased." So much, on the part of the purchasers. On the part of the company there was nothing — no agreement, no promise, no obligation of any sort. On its part the question of repurchase did not enter at all into the transaction of December thirtieth.

Much weight is given by counsel to the fact that the $30,000 paid for the 300 shares in December was not deposited in bank to the general credit of the company, but specially, and that a certificate of deposit was issued therefor payable to the order of the

company " approved by either three of the executive committee." This does not impress me as a matter of importance. No such special deposit was authorized by the company, nor was it afterwards approved by the directors as was the deposit of July 9, 1895. The purchase of the stock by the five was not made upon condition that the money should be so deposited. Mr. Deen testifies that the purchasers did not insist upon such a deposit, and there was no understanding that the money should be held in bank for the purpose of buying back the stock, nor for any particular purpose, nor for any particular period of time. Counsel for all of the defendants except Mr. Male say in their brief (speaking of the check deposited in July, 1895), " it cannot be doubted that when deposited to the credit of the Mercantile Company it became the property of that company, no matter how it was to be drawn out ; " and speaking of the check deposited on the thirtieth of December, they say : " No matter whether it was deposited subject to the check of either Mr. Male or Mr. Bach in the alternative, it certainly could have been attached by the creditors of the Mercantile Company and must be held to have been its property."

It is further insisted that the plaintiff, as receiver, can enforce only such right of action as the corporation had against these defendants and to which he has succeeded, which may be admitted (*Higgins* v. *Tefft*, 4 App. Div. 62); and that no right of action against the defendants or any of them for waste or other misconduct existed in favor of the Mercantile Company, for the reason that the purchase of the Reserve Company stock was not only expressly authorized by the stockholders at their special meeting on December 4, 1894, but was also approved by them at their annual meeting on February 4, 1897. The stockholders' resolution of December 4, 1894, was in these words : " *Resolved*, that the Board of Directors be and they are hereby authorized and instructed at their pleasure, and whenever they deem it to be to the interest of the company to do so, to purchase or buy from any source obtainable stock of the Reserve Company of New York, at a price not above the par value of said stock, and the money used in the purchase of said stock shall be deducted from the reserve or surplus of this company over and above its capital,  *  *  *  and the stock so pur-

chased shall not appear as an asset of the company." Now the defendants say that in purchasing the 300 shares of Reserve Company stock they were either performing a duty imposed, or exercising an authority or discretion conferred, upon them by the corporation through this resolution; hence the corporation could have no cause for complaint against them. That depends upon whether their judgment, exercised in good faith after a reasonable consideration of all the facts, was that it was "to the interest of the company" to make the purchase. I have already expressed the opinion that the testimony shows that there were no reasonable grounds for such a judgment. The testimony also satisfies me that in making the purchase the interest of the company was not considered. Had that been discussed or taken into account, certainly some one of the defendants could have explained how the conclusion was reached that it would be to the interest of the company to buy the stock. No such explanation was made or attempted, and one of the defendants, a gentleman of intelligence and large business experience, who was active in the affairs of the Mercantile Company and a party to the transaction in question, admitted on his cross-examination that the stock had not at any time any special market value, and that $30,000 in cash in the company's treasury was preferable to the 300 shares of stock, and to the question, "Are you able to mention any advantage to the company in the repurchase of that' stock?" answered, "No." The testimony makes it plain, I think, that the intention to use the stockholders' resolution as a means of getting rid of the 300 shares existed in the minds of the five defendants when they bought the shares of the company in December, 1895, and that that intention influenced them in making the purchase, and that when that intention was subsequently carried into execution neither the value of the stock nor the interest of the company was made a matter of consideration. In my judgment the resolution of December 5, 1894, furnishes no protection to those of the defendants who would otherwise be liable in this action.

I am also of the opinion that the liability incurred by the defendants, or some of them, by the purchase of the Reserve Company stock was not released nor in any respect affected by the resolution adopted at the stockholders' meeting on February 4, 1897. In determining the effect of that resolution due regard must be had to

the character of the transaction which it is claimed was validated by it. Of a similar transaction the court said in *Munson* v. *S., G. & C. R. R. Co.* (103 N. Y. 73): "He stood in the attitude of selling as owner and purchasing as trustee. The law permits no one to act in such inconsistent relations. It does not stop to inquire whether the contract or transaction was fair or unfair. It stops the inquiry when the relation is disclosed, and sets aside the transaction or refuses to enforce it at the instance of the party whom the fiduciary undertook to represent without undertaking to deal with the question of abstract justice in the particular case. It prevents frauds by making them as far as may be impossible, knowing that real motives often elude the most searching inquiry, and it leaves neither to judge nor jury the right to determine, upon a consideration of its advantages or disadvantages, whether a contract made under such circumstances shall stand or fall."

It is not denied that a transaction falling within the condemnation of this rule may be accepted and ratified by the party entitled to avoid it, but the intention of the party to ratify the particular transaction must be clearly manifested. "Full knowledge of the act assented to, and an intention to adopt the act as the act of the corporation are, therefore, essential. A corporation can never be charged with an unauthorized act of its agents, on the sole ground that the act has been ratified by the shareholders, unless the shareholders had full knowledge of the act." (2 Morawetz Corp. [2d ed.] § 628.) It appears that of the total capital stock of the Mercantile Company, 1,362 out of 2,000 shares were represented at the stockholders' meeting on February 4, 1897. Of these 1,362 shares a majority, or 787 shares, were held by the defendants in this action. Of the remaining 575 shares 509 were represented by proxies, nearly all of which were held and voted by Mr. Deen. It will be seen, therefore, that the meeting was entirely in the hands of the parties whose official acts are said to have been presented for approval and approved. The resolution adopted was as follows: "It was moved, seconded and carried — Resolved, that all acts of the Board of Directors and its Executive Committee for the past year be approved and confirmed." If the purchase of the Reserve Company stock was a wrongful use and a waste of the funds of the Mercantile Company, as in my opinion it was, then the parties, who, as

officers of the company, participated in it, were not qualified or competent, as stockholders, to discharge themselves from liability for the injury done to the company by their malfeasance. This is frankly admitted by at least one of the learned counsel for the defense. Even if the resolution had been adopted by the votes of a majority of stockholders, not officially related to the company, and voting in person, it should be held to operate only to the extent that the stockholders were informed of the "acts" which they were invited to confirm. In *Farmers' Loan & Trust Co.* v. *San Diego St. Car Co.* (45 Fed. Rep. 518, 527) the defendant company had issued bonds for the purposes of construction, equipment, operation, etc. They were diverted by some of the officers and pledged to secure debts existing against the company. The court said: "It is contended that if the pledging of the bonds in question was not originally valid, it was made so by the resolution adopted at the stockholders' meeting of January 28th, 1889, by which all the acts of the board of directors and officers of the company during the year then last past was* confirmed, ratified and approved. If the pledging of the bonds in question admitted of ratification, I do not think, in view of the evidence in the case, that the general and sweeping resolution ratifying 'all the acts of the officers' constituted a valid ratification of the acts in question. I think the record fails to show the *knowledge of facts* that is requisite to the validity of such ratification." This language seems to be precisely applicable to the case in hand. The record of the entire proceedings of the stockholders' meeting is in evidence. A report was read by the president "showing the position of the company, the amount of insurance written, fees collected and in course of collection, and the expenses incurred." It does not appear that any reference, direct or indirect, was made to either the expenditure of $30,000 in the purchase of Reserve Company stock or the "loan" to Berry. It can hardly be doubted that the only persons present at the meeting (with perhaps one exception) who had any knowledge of these transactions were those who had authorized them and carried them through and benefited by them. The defense of ratification ought not to be sustained.

My conclusion is that the plaintiff is entitled to judgment against some of the defendants. Not against Fitzgerald, for he did not

---

* *Sic.*

unite with the others either in authorizing the purchase (*Hun* v. *Cary*, 59 How. Pr. 430), or in approving it when made, nor was he interested in the stock sold to the company. Nor against Hinckley, for he was not interested in the stock or its proceeds, and had no connection with the transaction beyond voting in November to approve the purchase which had been made and paid for in the preceding March. It is claimed in behalf of Mr. Male that no recovery can be had against him inasmuch as the charge in the complaint is that the defendants "as directors * * * authorized and directed the purchase of and did purchase" the Reserve Company stock, and that such authority and direction were given at a directors' meeting on February 5, 1896, at which he was not present. This, it seems to me, is not sufficient to excuse him. While he did not vote to authorize the purchase, he took an important part in carrying it through; he furnished part of the stock which was purchased under the authority of the resolution; he indorsed the certificate of deposit by which the Mercantile Company was enabled to obtain the moneys with which the stock was paid for; he received his share of such moneys on the third of March; on the next day, as a member of the executive committee, he voted to authorize the loan to Berry, which was, in effect, an approval or adoption of the transactions of the day preceding, and at the directors' meeting in November he voted to ratify the action of the president in purchasing the stock.

The remaining question is that of damage. The Mercantile Company paid $30,000 in cash for the 300 shares of stock. The character and quality of the stock and the property or assets of the Reserve Company represented by it have already been described. The stock was not available to the Mercantile Company as an asset. It could not be sold, as there was no market for it. The actual loss sustained by the Mercantile Company through the action of the defendants was $30,000, less the sum of $1,241.67 which it received, or retained, rather, as dividends on the stock. The fact that two or three dividends were declared during 1896 on account of insurance written during 1895 does not, under the facts disclosed by the evidence, go far in the direction of showing that the stock itself had any real or substantial value at the time of the sale. The proofs convince me that it had no such value.

As to the defendants Fitzgerald and Hinckley the complaint should be dismissed, with costs. As against the other defendants, the plaintiff is entitled to judgment for $30,000 and interest, less $1,241.67, with costs.

The plaintiff, if so advised, may amend his complaint so as to conform it to the proofs relating to the date of the purchase of the stock.