**David L. SUBIN, Plaintiff-Appellant,**

v.

**A. Philip GOLDSMITH, Abraham Feinberg, Benjamin Hinerfeld, F. Stafford Cleary, J. A. C. Mueller, T. H. Mueller, J. J. Murphy, William B. Terry, G. H. Carr and Julius Kayser & Co., a New York Corporation, Defendants-Appellees.**

**No. 198, Docket No. 23348.**

United States Court of Appeals, Second Circuit.

Argued February 15, 16, 1955.

Decided June 3, 1955.

Frank and Medina, Circuit Judges, dissented in part.

Hays, St. John, Abrahamson & Schulman, New York City (Osmond K. Fraenkel, Seymour M. Heilbron, New York City, David W. Niesenbaum, Philadelphia, Pa., and Irwin Karp, New York City, of counsel), for plaintiff-appellant.

Ferris, Adams & Creidy, New York City, for appellee Goldsmith.

Gainsburg, Gottlieb, Levitan & Cole, New York City, for appellees, Feinberg and Hinerfeld.

Parker, Chapin & Flattau, New York City, for appellees, Mueller et al.

Alvin McK. Sylvester, Samuel Gottlieb, George A. Ferris and Joseph Levy, New York City (of counsel).

Before FRANK and MEDINA, Circuit Judges, and BRENNAN, District Judge.

FRANK, Circuit Judge.

Plaintiff, a stockholder of defendant Julius Kayser & Co., filed a complaint on August 12, 1954, seeking an injunction against that company and the individual defendants who are its directors, from holding a stockholders' meeting to be held on August 20, 1952, to approve a contract for the purchase by Kayser of most of the assets of Diamond Hosiery Corp. Plaintiff moved for a preliminary injunction; the judge denied the motion. The stockholders' meeting was held and there the contract was approved by holders of a majority of the shares. Plaintiff then filed an amended complaint. A copy of that amended complaint is set forth in the Appendix to this opinion.

The amended complaint contained five counts. The first four allege violations of a federal statute. Count V alleges a non-statutory wrong. On defendants' motions, the judge dismissed Counts I, II, III and IV for failure to state causes of action, and entered summary judgment dismissing Count V. Plaintiff has appealed.

All three members of this panel of the court agree on affirmance as to the dis-

missal of Count II. Judge Brennan and I agree that there must be a reversal as to Count V; Judge Medina dissents in this respect, for reasons stated in his separate opinion. For reasons also stated in Judge Medina's opinion, a majority of this panel holds that the judgment of dismissal of Counts I, III and IV must be affirmed. For reasons I shall state below, I agree as to Count I. But I dissent as to Counts III and IV for reasons stated in a separate opinion, infra. It is convenient to begin with Count V.

### 1. Count V

■ Count V is a derivative claim on behalf of defendant Kayser & Co. Through incorporation by reference of other parts of the complaint, it sufficiently alleges (1) diversity of citizenship and the necessary jurisdictional amount, (2) that plaintiff was a shareholder at the time of the transaction of which he complains, (3) that the action is not collusive, and (4) that it would have been futile to make a demand upon the Board of Directors to bring the suit.[1] These allegations satisfy the jurisdictional requirements and Fed.Rules Civ.Proc. rule 23 (b), 28 U.S.C.A.

This count further alleges that the Kayser company, on July 22, 1954, entered into a contract with Diamond Hosiery Corporation for the purchase by Kayser of the assets of Diamond; that this contract was made "at the instigation and direction of" defendants Goldsmith, Feinberg and Hinerfeld, who are directors of Kayser; that these three defendants dominate and control the Kayser Board of Directors and its management, through their control of three companies, Diamond, Hillcrest and Hamilton, which together are the controlling stockholders of Kayser (so that Gold-

smith, Feinberg and Hinerfeld thus control both the buyer and seller under the Kayser-Diamond contract); that the purchase by Kayser of the Diamond assets will constitute an improper and wasteful expenditure of Kayser's funds which will be detrimental to it and will be solely for the benefit of Goldsmith, Hinerfeld and Feinberg; that the Diamond assets are not needed by Kayser and are not worth the price paid for them; and that the contract imposes on Kayser a burdensome lease, the lessor under which is a company in which Goldsmith, Feinberg and Hinerfeld have a large interest.

■■ Those allegations state a valid derivative action. See, e. g., Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281; Sage v. Culver, 147 N.Y. 241, 247, 41 N.E. 513; Perlman v. Feldman, 2 Cir., 219 F.2d 173. We see no reason why greater particularity of allegations should be required in a stockholders' derivative action than in many another sort of action such as, e. g., one for accounting, or for treble damages because of an anti-trust law violation, as to which see, e. g., Package Closure Corp. v. Sealright Co., 2 Cir., 141 F.2d 972, 978.

Defendants did not move for dismissal of this Count for failure to state a cause of action. They did move for summary judgment. The judge granted their motion. We think he erred.

In support of their motion, defendants introduced four affidavits.[2] Two of them were by defendants' lawyers; so far as they bear at all on Count V, they were not based on "personal knowledge," and therefore do not suffice under F.R.C.P. 56(e).[3] A third affidavit, by an account-

---

1. This Count does not specifically allege that the suit is on behalf of the Kayser Company. But it makes allegations required by Rule 23(b) only in cases of a stockholders' derivative action, and therefore, by plain implication, is derivative. Moreover, defendants, neither in the district court nor in this court, argued any deficiency on that score, nor did the district judge mention it; ac-

cordingly, if this omission were important, plaintiff should be permitted to amend to that extent.

2. Three of these affidavits had been presented previously in opposition to plaintiff's motion for a preliminary injunction.

3. Rule 56(e) requires that affidavits, on a summary judgment motion, "shall be

ant, contained nothing which related in any way to this Count.

 The fourth affidavit was that of defendant Feinberg, only a portion of which related to this Count. That portion consists of his opinion and his statements about the views of the other directors. If at a trial he were to testify, his opinion as a director would be admissible. But, without evidence of the views of the other directors, his opinion alone would not support a directed verdict, or judgment, for the defendants; nor would his testimony concerning their views, since such testimony would be hearsay and consequently not "competent" evidence.[4] Therefore his affidavit was insufficient under F.R.C.P. 56(e).

Even if, however, we disregarded that objection, Feinberg's affidavit could not support the summary judgment. The pertinent facts stated in that affidavit are as follows: The Kayser directors believed and decided that the acquisition of the Diamond business would benefit Kayser. Among the benefits were these: There would result a 50% increase in the gross business of Kayser interests; the addition of the Diamond business will treble Kayser's volume of hosiery business; Kayser will obtain the services of Goldsmith who has been outstandingly successful in the hosiery business; Kayser will acquire an excellent merchandising and selling organization; the addition of the Diamond business will round out the line of Kayser's products; Feinberg estimates conservatively that the absorption of the Diamond business will make possible savings which will add a minimum of $700,000 to Kayser's annual earnings before taxes, and this figure should go higher when overlappings of the two organizations are eliminated as the directors are confident they will;

Kayser will get the benefit of some $500,-000 of unfilled orders. We shall assume, arguendo, that Feinberg's affidavit, if taken as true, completely contraverted the allegations of Count V. But we have held that, in such a derivative stockholders' suit—especially as to facts peculiarly within the knowledge of the defendants—plaintiff is entitled to a trial at which he may cross-examine the defendants and at which the trial judge can observe their demeanor in order, thereby, to evaluate their credibility.

See Fogelson v. American Woolen Company, 2 Cir., 170 F.2d 660. It was a derivative suit seeking to enjoin the company and its directors from carrying out a proposed pension plan. The defendant company moved for a summary judgment. In support of the motion, it filed the affidavits of all the directors, in which each swore that he had participated in the decision of the Board of Directors and had done so because he thought it for the best interest of the company; these directors, who made such affidavits, included a former Governor of Massachusetts, a former Governor of the Federal Reserve Board, a former Assistant Secretary of the Treasury.[5] The trial judge granted the motion on the ground that these affidavits showed an exercise of judgment by the Board of Directors with which a court should not interfere. See, D.C., 79 F.Supp. 291. We reversed, saying, per Judge Swan,[5a] 170 F.2d at 622: "Courts are properly reluctant to interfere with the business judgment of corporate directors; they do so only if there has been so clear an abuse of discretion as to amount to legal waste. See McQuillen v. National Cash Register Co., 4 Cir., 112 F.2d 877, 884, certiorari denied 311 U.S. 695, 61 S.Ct. 140, 85 L.Ed. 450. In setting up a retire-

---

made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

4. See, e. g., Jameson v. Jameson, 85 U.S. App.D.C. 176, 176 F.2d 58, 60; United States v. Britten, 3 Cir., 161 F.2d 921,

928; Cf. Automatic Radio Mfg. Co. v. Hazeltine, 339 U.S. 827, 831, 70 S.Ct. 894, 94 L.Ed. 1312.

5. See Transcript of Record in that case, pp. 57–72.

5a. The court consisted of Judges Learned Hand, Swan and Chase.

ment pension plan, the decision of the directors to fund past service benefits by a single lump-sum payment rather than by instalment payments over a term of years, will normally be conclusive. So also will their decision as to the desirability of applying a percentage formula uniformly to all employees' salaries without imposing a limitation in dollars upon the maximum pension payable to high salaried officers. In the case at bar the adoption of these features results in giving the president an annual pension for life of more than $54,000 a year while the employee receiving the next largest pension will receive only $7,285. The complaint alleges that the very purpose of the proposed lump-sum payment to a pension trustee is to secure to the president his large pension free from the hazard of future business vicissitudes to which the corporation will be subject. This allegation is denied by the answer, and the denial is supported by affidavits of the directors that each director who voted for the plan exercised his best business judgment. But this denial would be refuted if the plaintiffs were able to prove that the real purpose was as alleged. Therefore a triable issue of fact exists as to whether the directors did exercise their honest business judgment or were motivated by the alleged purpose of favoring the president. It may be unlikely that the plaintiffs can prove their allegation, for such proof must be drawn largely from the directors themselves by cross-examination; but we do not think that their affidavits must be accepted as conclusive and thus preclude any trial of that issue. See Arnstein v. Porter, 2 Cir., 154 F.2d 464, 469–471; Winkelman v. General Motors Corp., D.C.S.D. N.Y., 39 F.Supp 826, 835."

In Bozant v. Bank of New York, 2 Cir., 156 F.2d 787, 790, we said, per Judge Learned Hand: [6] "In conclusion we cannot avoid observing that the case is another mistaken effort to save time by an attempt to dispose of a complicated state of facts on motion for summary judgment. This is especially true when the plaintiff must rely for his case on what he can draw out of the defendant. Arnstein v. Porter, 2 Cir., 154 F.2d 464. It appears to be somewhat difficult to persuade the district courts of this; but we are satisfied that it is true." In Colby v. Klune, 2 Cir., 178 F.2d 872, 873–875, reversing a summary judgment for defendants, we said: [7] "For the affidavits do not supply all the needed proof. The statements in defendants' affidavits certainly do not suffice, because their acceptance as proof depends on credibility; and—absent an unequivocal waiver of a trial on oral testimony—credibility ought not, when witnesses are available, be determined by mere paper affirmations or denials that inherently lack the important element of witnesses' demeanor. As we observed in Arnstein v. Porter, 2 Cir., 154 F.2d 464, 471: 'It will not do, in such a case, to say that, since the plaintiff, in the matter presented by his affidavits, has offered nothing which discredits the honesty of the defendant, the latter's deposition must be accepted as true.' For the credibility of the persons who here made the affidavits is to be tested when they testify at a trial. Particularly where, as here, the facts are peculiarly in the knowledge of defendants or their witnesses, should the plaintiff have the opportunity to impeach them at a trial; and their demeanor may be the most effective impeachment. Indeed, it has been said that a witness' demeanor is a kind of 'real evidence'; obviously such 'real evidence' cannot be included in affidavits. In Sartor v. Arkansas Natural Gas Corp., Kansas Group, 321 U.S. 620, 628, 64 S.Ct. 724, 729, 88 L.Ed. 967, the Court said that a summary judgment may not be used to 'withdraw these witnesses from cross-examination, the best method yet devised for testing trustworthiness of testimony'; the Court, in that connection, quoted with approval from Aetna Life Insurance Co. v. Ward,

---

6. The court consisted of Judges Learned Hand, Swan and Chase.

7. The court consisted of Judge Learned Hand, Swan and the writer of the present opinion.

140 U.S. 76, 88, 11 S.Ct. 720, 724, 35 L.Ed. 371: 'There are many things sometimes in the conduct of a witness upon the stand, and sometimes in the mode in which his answers are drawn from him through the questioning of counsel, by which a jury are to be guided in determining the weight and credibility of his testimony.'

"Nor is the situation different because the trial will be before a trial judge without a jury. For how can the judge know, previous to trial, from reading paper testimony, what he will think of the testimony if and when, at a trial, he sees and hears the witnesses? It is because of the crucial element of demeanor-observation that a trial judge's findings are usually binding unless 'clearly erroneous' ; his findings have not that effect when he has not observed the witnesses.

" 'All manner of expedients,' says Dean Pound, 'have been resorted to * * * to arrive at a written settlement of the facts not dependent on the credit to be accorded witnesses or the impression they may make on the particular trial court. * * * But experience has shown that we cannot be sure that in getting a clear-cut statement of facts in this way, to which the law may be applied, we are not cutting out too much, so in the end to be trying an artificial case instead of the real controversy.'

"It may happen (although we do not know) that, because of their unavailability at the trial, plaintiff will be obliged to obtain the testimony of some or all of the defendants' witnesses by deposition. If so, the demeanor-aspect of their testimony will be lost; however, he will at least have the chance to cross-examine them, an opportunity he has not yet had."

See Toebelman v. Missouri-Kansas Pipe Line Co., 3 Cir., 130 F.2d 1016, 1022, a stockholders' derivative action: "It is obvious that this evidence must come largely from the defendants. This case illustrates the danger of founding a judgment in favor of one party upon his own version of facts within his sole knowledge as set forth in affidavits prepared ex parte. Cross-examination of the party and a reasonable examination of his records by the other party frequently bring forth further facts which place a very different light upon the picture."

In Loudermilk v. Fidelity & Casualty Co. of New York, 5 Cir., 199 F.2d 561, 565, it was said: "This is not the kind of case that can be settled on summary judgment. It is peculiarly the kind of case where the triers of fact whose business it is not only to hear what men say but to search for and find the roots from which the sayings spring, should be afforded full opportunity to determine the truth and integrity of the case. Cf. Gray Tool Co. v. Humble Oil & Refining Co., 5 Cir., 186 F.2d 365, at page 367; Colby v. Klune, 2 Cir., 178 F.2d 872, 873." See also Sarnoff v. Ciaglia, 3 Cir., 165 F.2d 167, 168; Dulansky v. Iowa-Illinois Gas & Electric Co., 8 Cir., 191 F.2d 881, 883–884; Avrick v. Rockmount Envelope Co., 10 Cir., 155 F.2d 568, 571, 573; Lane Bryant, Inc., v. Maternity Lane, Ltd., 9 Cir., 173 F.2d 559, 564–565.

■ An opponent's failure to file counter-affidavits does not in this kind of case compel acceptance as true of facts alleged in the movant's affidavits. In Albert Dickinson Co. v. Mellos Peanut Co., 7 Cir., 179 F.2d 265, 268, the court said: "It is undoubtedly a somewhat hazardous course of procedure on a motion for summary judgment for the adverse party not to file an answering or opposing affidavit, where the moving party has filed an affidavit in support of his motion. However, we do not think an inflexible rule should be established that in every case the adverse party be penalized right out of court for not filing an opposing affidavit * * *." See also Griffith v. William Penn Broadcasting Co., D.C.E.D.Pa., 4 F.R.D. 475, 477 ("Defendant's failure to file a counter-affidavit to support its opposition to the motions is of no significance."); Bowdle v. Automobile Ins. Co. of Hartford, D.C. Del., 99 F.Supp. 161.

■ There are cases where facts stated in a movant's affidavits or exhibits (e. g., that a certain document was executed on a stated date) should be taken

as true, unless controverted in the opponent's affidavits, as, e. g., where the contrary facts are peculiarly within the opponent's knowledge, or where they can be developed by his own investigation rather than by cross-examination: In Dixon v. American Tel. & Tel. Co., 2 Cir., 159 F.2d 863, plaintiff sued for review of an earlier adverse judgment; defendants pleaded laches in failure to sue more promptly and moved for summary judgment. Plaintiff by affidavit alleged facts, e. g., illness, which might have satisfactorily explained part of his delay, but which did not cover the entire period during which he had delayed. All facts pertaining to laches—e. g., alleged incompetency of plaintiff's attorneys in the earlier suit, sickness, etc.—were exclusively within plaintiff's knowledge. No additional facts could have been developed and exposed by plaintiff through cross-examination of defendants. His failure, then, to allege facts sufficient to controvert the allegation of laches was properly considered, in effect, an admission of laches. In Gifford v. Travelers Protective Association, 9 Cir., 153 F.2d 209, the plaintiff sued on a fraternal insurance policy. The defendant moved for summary judgment on the ground that the suit was brought beyond the time allowed by the articles of the association as incorporated in the policy. The movant introduced the articles of the association and a letter in which it had denied liability, and rested. The court granted summary judgment. If there were any facts by which plaintiff might have avoided the result plainly indicated by the articles of the association, they were within plaintiff's knowledge, and not to be developed through cross-examination of the defendant. The trial court had given plaintiff extra time in which to plead any facts by which he could have avoided the contractual limitation, and his failure to do so was properly considered, in effect, as an admission of the truth of the movant's position.

Similarly, in Lawson v. American Motorists Ins. Corp., 5 Cir., 217 F.2d 724, in a suit on an insurance policy, defendant pleaded that the plaintiff had not filed proof of loss within 100 days after discovery of loss as required by the contract. Plaintiff filed no counter-affidavits and the court found that the plaintiff's deposition made clear that he had never filed proof of loss. In the absence, then, of any facts (which, if they existed, were within the plaintiff's knowledge) satisfactorily explaining the failure to file, the court granted the summary judgment.

But where—as, e. g., in Fogelson v. American Woolen Company, and Bozant v. Bank of New York, supra—the facts asserted by movant are peculiarly within the knowledge of the movant, then the opponent must be given the opportunity to disprove that fact by cross-examination and by the demeanor of the movant while testifying. In such a case—a case like the one before us—the failure of the opponent to file a counter-affidavit has no significance. For, in his counter-affidavit, he could do no more than to say, "I hope, at a trial, by cross-examination and 'demeanor evidence' of movant's affiants when they testify orally, to persuade the trial court to disbelieve them." Such a paper would be no real affidavit and would not comply with Rule 56(e) since it would not be based on "personal knowledge" and would not "set forth such facts as would be admissible in evidence". As it would be merely the equivalent of his opposition to the entry of a summary judgment, it would be superfluous. So in Garrett Biblical Institute v. American University, 82 U.S.App.D.C. 263, 163 F.2d 265, 267, the court, reversing a summary judgment for plaintiff-appellee, said: "And although appellant has made no offer to show the existence of evidence in support of its denial and defense, and there may be some doubt as to the existence of a defense, still much, if not all, of appellant's defense depends on a cross-examination of appellee's witnesses and an examination of appellee's documentary evidence, and we feel that since the defense is asserted in apparent good faith appellant is entitled to a trial which provides this opportunity to them. On

the record as it stands, we cannot say that 'it is quite clear what the truth is.' "

Winkelman v. General Motors Corp., D.C., 39 F.Supp. 826, cited by us with approval in Fogelson v. American Woolen Company, supra, goes to show the danger involved in granting a summary judgment for defendants in a derivative stockholders' suit on affidavits of defendants as to matters peculiarly within their knowledge. In Winkelman, after the judge denied summary judgment, the case went to trial and resulted in a judgment of some $7,900,000 (including interest) against these defendants (a judgment which was settled by the payment of $4,500,000).[8]

■ Of course, it is irrelevant that plaintiff owns but a few shares[9] (except upon a demand for security under the New York statute, a demand not yet made by defendants). Also irrelevant is the alleged fact, to which the district judge referred, that plaintiff is a competitor of Kayser. Nothing in the record so shows, but we shall assume, arguendo, that (as defendants assert) plaintiff's counsel so admitted in the court below. We assume, again arguendo, that this fact would have significance, if plaintiff's sole motive in suing were to aid his interest as competitor. Since, however, there was no such showing, we must take it that he was motivated at least in part by his stockholder interest. On that basis, his competitor-interest motive must be ignored. See Beardsley v. Kilmer, 236 N.Y. 80, 140 N.E. 203, 27 A.L.R. 1411; Aikens v. Wisconsin, 195 U.S. 194, 25 S.Ct. 3, 49 L.Ed. 154; Holbrook v. Morrison, 214 Mass. 209, 100 N.E. 1111, 44 L.R.A.,N.S., 228; (as to the difference between "dis-interested malevolence" and mixed motives).

■ Defendants contend that to compel them to go to trial will involve them in considerable expense which would be avoided by the summary judgment. In the Fogelson case, supra, we rejected such a contention. There is no more reason why defendants in a stockholders' derivative action should be relieved of expense, through the avoidance of a trial, than in any other kind of suit where preparation for and conduct of a trial will involve considerable cost. The argument about defense expenses is particularly inapposite here since, under Section 61-b of the New York General Corporation Law, McK.Consol.Laws, c. 23, defendants can demand and obtain from the plaintiff security for attorneys' fees and other expenses.

■ Count V alleges the approval of the contract by a vote at the stockholders' meeting of the holders of a considerable majority of the Kayser stock (which includes some 31% controlled by the controlling defendant-directors). Defendants urge that this approval serves as a complete defense. We do not agree, since under the allegations of Count V, the defendant-directors who dominated and controlled Kayser's Board had conflicting self-interests.[10]

■ It is suggested that, as apparently the transfer of the Diamond assets to Kayser was completed after denial of the preliminary injunction, a final injunction will serve no purpose, and therefore plaintiff, if he wins, can obtain no relief. To this suggestion there are two answers: (a) Should the ultimate decision go in plaintiff's favor, and

---

8. These facts can be found in this court's record in Singer v. General Motors Corp., 2 Cir., 136 F.2d 905.

9. Case v. Los Angeles Lumber Co., 308 U. S. 106, 116, 60 S.Ct. 1, 84 L.Ed. 110. Cf. The Code of Maimonides, Bk. IV, The Book of The Judges (Transl.1949) Ch. XX, Clause 10: "Think not that the foregoing rules apply only to a case involving a large sum of money to be taken from one [litigant] and given to the other. At all times and in all respects, regard a suit entailing one thousand maneh and one entailing a perutah as of equal importance."

10. Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 41 S.Ct. 209, 65 L. Ed. 425; Globe Woolen Co. v. Utica Gas & Electric Co., 224 N.Y. 483, 121 N.E. 378; Cf. Bowers v. Male, 111 App.Div. 209, 229, 97 N.Y.S. 722, affirmed 186 N.Y. 28, 78 N.E. 577.

should damages not constitute adequate relief, the court will require, by way of restitution, the undoing of the transfer of the assets from Diamond to Kayser if it has already occurred. It will be no bar to such restitution that the district court denied the preliminary injunction.[11] To be sure, such undoing of the transfer will require Diamond to act, and Diamond is not a party. But defendant Goldsmith controls Diamond, and the court can order him to cause Diamond to do the needful. (b) The complaint asks "for such other and further relief as may be just and proper." Accordingly, the court can award damages if they will afford adequate relief. See F.R.C.P. 54 (c).

 Defendants, in their brief and oral argument, made much of the reputations and characters of the individual defendants. Of course, we cannot consider any such factor: If, on a trial, it turns out that they did what they are charged with, their previous good behavior will not matter; on the other hand, at this stage of the case, we do not at all suggest that they did anything improper, for only after a trial can that be determined.

### 2. Count II

 Count II rests entirely on Section 29(b) of the Securities and Exchange Act, 15 U.S.C.A. § 78cc(b), which relates solely to a contract made in violation of "any provision" of the Act or of "any rule or regulation thereunder". Here the contract itself was not thus violative. So that, even if the allegations stated a violation of the Rule, the dismissal of this Count was correct.

### 3. Counts I, III and IV

Counts I, III and IV rest on an alleged violation of a federal statute and regulation in connection with a proxy statement sent to stockholders of the Kayser Company. These Counts are substantially identical except that Counts III and IV are derivative while Count I is not.

As noted above, a majority of the court —for reasons stated in the separate opinion of Judge Medina—holds that the district judge, on defendants' motion, correctly dismissed each of these three Counts for failure to state a cause of action.

I concur as to Count I because I think that, quite aside from New York decisions[12] which do not govern here, such a claim must be asserted derivatively on behalf of the Kayser Company. I dissent as to the dismissal of Counts III and IV.

### 4. Judge Frank's Dissenting Opinion, with respect to the dismissal of Counts III and IV.

I think the district judge erred in dismissing Counts III and IV. As they are substantially identical, I shall discuss Count III only. That count alleges violations of Section 14(a) of the Securities and Exchange Act as amended—15 U.S. C.A. § 78n(a)—and of SEC Rule X–14A–9.

Section 14(a) reads: "It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of any national securities exchange or otherwise to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered on any national securities exchange in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

The SEC Rule reads: "No solicitation subject to this regulation shall be made by means of any proxy statement, form

11. Welton v. 40 East Oak Street Building Corp., 7 Cir., 70 F.2d 377, 381–382; Restatement of Restitution, Sec. 74; cf. Golde Clothes Shop v. Loew's Buffalo Theatres, 236 N.Y. 465, 470–471, 141 N.E. 917, 30 A.L.R. 931.

12. See Schreiber v. Butte Copper & Zinc Co., D.C., 98 F.Supp. 106; Gordon v. Elliman, 306 N.Y. 456, 119 N.E.2d 331; Lehrman v. Godchaux Sugars, Inc., 207 Misc. 314, 138 N.Y.S.2d 163.

of proxy, notice of meeting, or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material facts, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

Count III alleges that the contract provided it would not be performed unless approved at a stockholders' meeting of Kayser; that, in advance of this meeting, the defendants solicited proxies and sent to each of the Kayser stockholders a proxy statement; and that this proxy statement violated Section 14(a) and the SEC Rule, in that (1) it contained statements which were false and misleading and (2) it "omitted to state material facts necessary in order to make the statements therein not false or misleading." It also alleges that the defendants knew of the respect in which the proxy statement was false and misleading, and knew of the omissions of material facts, and that the proxy statement was read by many stockholders of Kayser who were thereby misled and induced to grant their proxies in favor of affirmance of the transaction at the stockholders' meeting and to vote in favor thereof at that meeting. It further alleges that the proxy statement was false or misleading in

(a) that it affirmatively but incorrectly stated that it fully described the direct and indirect self-interests of defendants Goldsmith, Feinberg and Hinerfeld, in the Kayser-Diamond contract, and

(b) that it omitted to state material facts, concerning their interests, which facts were "necessary in order to make the statements therein not false or misleading."

As to (a), the proxy statement did disclose this much of the self-interest of the three defendants: On or about May 13, 1954, three companies—Diamond, Hillcrest and Hamilton—each acquired about 10.4% of the Kayser stock; defendant Goldsmith controls Diamond, and defendant Feinberg and defendant Hinerfeld control Hillcrest and Hamilton; Goldsmith, Feinberg and Hinerfeld are directors of Kayser. From this perhaps it may be fairly inferred that, as the complaint alleges, these three defendants control the Board of Directors of Kayser. So far, so good.

But Count III specifically alleges that the proxy statement did not disclose the following facts: In order to purchase these Kayser shares, those three companies had made loans, and, through the consummation of the Kayser-Diamond contract, Diamond would obtain funds which would be used to pay those loans.

My colleagues, however, surprisingly say that, although Count III does refer to those loans, yet "nowhere in the amended complaint is it alleged that such loans were made." I find it difficult to comprehend how my colleagues reach that conclusion. For Count III—in addition to the allegations above described, concerning the control by Goldsmith, Feinberg and Hinerfeld of both the seller, Diamond, and the buyer, Kayser— contains the following allegations:

"Diamond Hosiery Corporation (hereinafter called 'Diamond'), Hamilton Textile Mills, Inc. (hereinafter called 'Hamilton Textile') and Hillcrest Factors, Inc. (hereinafter called 'Hillcrest') are, upon information and belief, corporations duly organized and existing under and by virtue of the laws of the State of New York; on or about May 13, 1954, each of said of corporations purchased 10.4% of the outstanding common stock of the defendant Kayser, to wit, 62,442 shares were purchased by Diamond, 62,443 by Hillcrest and 62,442 by Hamilton Textile. Defendants Goldsmith, Feinberg and Hinerfeld are variously officers and directors of defendant Kayser and variously officers, directors and controlling stockholders of Diamond, Hillcrest and

Hamilton Textile. * * *[13] Said proxy statement omitted to state * * * the amount of money borrowed by Diamond, Hillcrest and Hamilton Textile to purchase the stock by Kayser, as aforesaid; the date or dates on which said corporations were required to repay such loans; and the portion of the purchase price to be paid by defendant Kayser to Diamond which will be used by Diamond, Hillcrest or Hamilton Textile respectively to repay such loans made by them for the purpose of acquiring the stock of defendant Kayser. * * *[14] Upon information and belief * * * the acquisition of said properties and assets will benefit defendants Diamond, Hillcrest and Hamilton Textile and Defendants Goldsmith, Feinberg and Hinerfeld * * * by enabling Diamond, Hillcrest and Hamilton Textile to acquire funds with which to pay for the stock of Kayser purchased by them, as aforesaid. * * * "[15]

This is not a mere "conclusory" allegation. It particularizes the violation of the Rule.

This court, like other courts, has often held that allegations far less clear are adequate on a motion to dismiss.[16] Unless—despite the Federal Rules of Civil Procedure—we revert to the days when courts construed pleadings with what today courts consider unreasonable strictness, I fail to see why these allegations do not fairly advise defendants that plaintiff is asserting that these loans "were made." If I understand my colleagues, they would reverse the dismissal of Count III, if only, in addition to the allegations I have just quoted, plaintiff had inserted the words, "These loans were made."

I cannot concur in a ruling that the dismissal was correct for failure to insert those four words. That ruling ignores the host of decisions, in this Circuit and elsewhere, to the following effect: On a motion to dismiss a complaint, its allegations must be considered most favorably to plaintiff; as thus construed, they must be taken as true; a complaint should never be dismissed on motion unless it "appears to a certainty" that the plaintiff would be entitled to no relief under any set of facts which could be proved in support of the claim."

See, e. g., United States v. Employing Plasterers' Association, 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618; Virgin Islands Corp. v. W. A. Taylor, & Co., 2 Cir., 202 F.2d 61, 65; Package Closure Corp. v. Sealright Co., 2 Cir., 141 F.2d 972, 978; Dioguardi v. Durning, 2 Cir., 139 F.2d 774; Callaway v. Hamilton National Bank of Washington, 90 U.S.App.D.C. 228, 195 F.2d 556, 559; Tiedeman v. Local 705, etc., 7 Cir., 180 F.2d 684, 686; Kingwood Oil Co. v. Bell, 7 Cir., 204 F.2d 8, 12–13; Mitchell v. Pilgrim Holiness Church, 7 Cir., 210 F.2d 879, 881; Continental Collieries v. Shober, 3 Cir., 130 F.2d 631, 635; King Edward Employees Federal Credit Union v. Travelers Indemnity Co., 5 Cir., 206 F.2d 726, 728; Knox v. First Security Bank of Utah, 10 Cir., 196 F.2d 112, 117; Porter v. Karavas, 10 Cir., 157 F.2d 984; 2 Moore, Federal Practice (2d ed.) pp. 2245–2246.

In Forstmann Woolen Company v. Murray Sices Corporation, D.C., 10 F. R.D. 367, 369, 370, Judge Medina said: "The Federal Rules of Procedure prescribe a simple method whereby claims and defenses may be stated. Rule 8, F.R.C.P. The rules, as construed, do not contemplate correction of inartistic pleadings by motion to strike, in the absence of some prejudice to the opposing party. See Moore's Federal Practice 2317–18 (2d Ed., 1948). If the allegations attacked are such that under some contingency they may raise relevant is-

---

13. See, in the Appendix to this opinion, amended complaint, paragraphs 5 and 6 of Count III, incorporated by reference in Count III.

14. See amended complaint, paragraph 15 (i) of Count I, incorporated by reference in Count III.

15. See amended complaint, paragraph 14 (b), of Count I, incorporated by reference in Count III.

16. See, e. g., 2 Moore, Federal Practice (2d ed.) pp. 2245–2246.

sues, they will not be stricken. Moore, op.cit. supra, at 2318; see American Machine & Metals Co. v. De Bothezat Impeller Co., D.C.S.D.N.Y.1948, 8 F.R.D. 306. * * * Of course, it is only necessary that the allegations constitute a statement of a claim upon which relief may be granted, see Dioguardi v. Durning, 2 Cir., 1944, 139 F.2d 774; Camrel Co. v. Skouras Theatres Corp., D.C.N.J. 1944, 57 F.Supp. 811, 812; and under the Federal Rules a pleading should not be dismissed unless it appears to a certainty that the pleader is entitled to no relief under any state of facts which could be proved in support of the claim. Moore, op.cit. supra, at 2245." [17]

The portion of the proxy statement relating to the interests of Goldsmith, Feinberg and Hinerfeld reads in its entirety as follows:

"A. Phillip Goldsmith a director of the Company is an officer and director of Diamond. Mr. Goldsmith and his associates, none of whom are directors or officers of the Company, own 75% of the issued and outstanding stock of Diamond. Diamond is the beneficial owner of 62,442 shares or approximately 10.4% of the issued and outstanding shares of Common Capital Stock of the Company.

"Abraham Feinberg, a director and Chairman of the Board of Directors of the Company, and Benjamin Hinerfeld, a director of the Company and its Executive Vice President, are each officers and directors, and, in conjunction with their associates, are the beneficial holders of a majority of the issued and outstanding stock of Hillcrest Factors, Inc. and Hamilton Textile Mills, Inc. respectively. Hillcrest Factors Inc. owns 62,443 shares or approximately 10.4% of the issued and outstanding shares of Common Capital Stock of the Company and Hamilton Textile Mills, Inc. owns 62,442 shares or approximately 10.4% thereof.

"Hamilton Textile Mills, Inc. is an affiliate of and Messrs. Feinberg and Hinerfeld are associates of the lessor under the Hamilton lease, above referred to, which lease was negotiated and entered into with Diamond as lessee in 1953 prior to the time that any of the persons named above in this caption became holders of the Common Capital Stock of the Company. Diamond, Hamilton Textile Mills, Inc, and Hillcrest Factors Inc. became stockholders of the Company on May 13, 1954."

This statement omits any mention whatever of the facts about the loans. I think this omission, this non-disclosure, rendered the proxy statement violative of Section 14(a) of the Act and the SEC proxy Rule. For the provision of the Kayser-Diamond contract requiring the vote of the Kayser stockholders necessitated the issuance of a proxy statement complying with that section of the Act and that Rule. Because those three defendants controlled Kayser, they owed a fiduciary obligation to the other Kayser stockholders. See, e. g., Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281; Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 599, 41 S.Ct. 209, 65 L.Ed. 425; Sage v. Culver, 147 N.Y. 241, 247, 41 N.E. 513; Perlman v. Feldman, 2 Cir., 219 F.2d 173. That fiduciary obligation, plus Section 29(a), 15 U.S.C.A. § 78cc(a), and the Rule, made the omitted matter plainly material.

It follows that the proxy statement violated the statute and the Rule, because (a) it affirmatively stated that it fully disclosed all self-interests and thus contained a statement which was "false or misleading with respect to" a "material fact," and (b) it omitted to state material facts necessary to make it "not false or misleading."

Such a violation supports a civil action in a federal court. To be sure, Section 14(a) of the Act reads, "It shall be unlawful * * *." Other defendants, when sued civilly, under other similarly worded sections of this Act, the Securities Act, 15 U.S.C.A. § 77a et seq., or oth-

---

17. See also Judge Medina in Sebo v. United Air Lines, Inc., D.C., 10 F.R.D. 327, 329.

er similar statutes, have urged that such language does not authorize a civil suit by a private person. This court and other courts have refused to accept that argument. See Goldstein v. Groesbeck, 2 Cir., 142 F.2d 422, 427, 154 A.L.R. 1285; Fischman v. Raytheon Mfg. Co., 2 Cir., 188 F.2d 783, 787, and cases there cited in note 4; Baird v. Franklin, 2 Cir., 141 F.2d 238; Fratt v. Robinson, 9 Cir., 203 F.2d 627, 632, 37 A.L.R.2d 636; Remar v. Clayton Securities Corporation, D.C., 81 F.Supp. 1014, 1017.

It has been suggested that the allegations do not satisfy F.R.C.P. 9(b) which requires that, in any "averments of fraud * * * the circumstances constituting fraud or mistake shall be stated with particularity". Since appellees did not raise this question in the district court or in this court, plaintiffs, if there were not a compliance with Rule 9(b), should be permitted to amend in this respect. But I think that Rule has no application here, since the claim in Count III is not for fraud but for violation of the statute and the SEC Rule. It has been held that a claim based on a similar statutory violation is not one for common law fraud, for the reason that some of the elements of such fraud need not be proved. Fischman v. Raytheon Mfg. Co., 2 Cir., 188 F.2d 783, 786; Norris & Hirshberg, Inc., v. S. E. C., 85 U.S.App.D.C. 268, 177 F.2d 228, 233; Hughes v. S. E. C., 85 U.S.App. D.C. 56, 174 F.2d 969, 975.

Moreover, I think that, if Rule 9(b) does apply, the allegations are specific enough to meet its requirements: For a violation of Section 14(a) and the SEC Rule, there may be either a civil suit or a criminal prosecution. Section 32(a) of the Act, 15 U.S.C.A. § 78ff(a). If an indictment for such a violation contained the allegations of Count III above described, it would withstand a motion to quash, as those allegations are not only in the language of the statute and the SEC Rule but go further and state particular facts sufficiently to advise the defendants of the charge against them. See, e. g., United States v. Achtner, 2 Cir., 144 F.2d 49, 51; United States v. Kushner, 2 Cir., 135 F.2d 668, 673; Butzman v. United States, 6 Cir., 205 F.2d 343, 348; Hagner v. United States, 285 U.S. 427, 430, 431, 52 S.Ct. 417, 76 L.Ed. 861; Wheeler v. United States, 9 Cir., 77 F.2d 216, 218; S. E. C. v. Timetrust, Inc., D.C., 28 F.Supp. 34, 42. If the allegations would suffice in an indictment in a criminal action, where a man's liberty is at stake, they must suffice in a civil complaint affecting merely defendants' property.

In Levenson v. B. & M. Furniture Co., 2 Cir., 120 F.2d 1009, we said: "The petition at bar does not indeed allege the fraud with as much particularity as is desirable. But the omission is not fatal; it is only a pleading, and Rule 8(f), 28 U.S.C.A. following section 723c, demands that it 'shall be so construed as to do substantial justice.' Its general purport is plain enough, and if the debtor had really any doubt about its meaning— which plainly it had not—it had, and still has, relief under Rule 12(e); the day has passed when substantial interests stand or fall for such insubstantial reasons." See Gulf Coast Western Oil Co. v. Trapp, 10 Cir., 165 F.2d 343 where the court originally held, at page 347, the allegations insufficient, but on rehearing said, at page 351, that the allegations "set out the primary fundamental facts, which, if true, would require the defendant to account. They furnish all necessary information enabling Trapp to refute them if they are untrue, and to prepare his defense thereto." See also Perrott v. U. S. Banking Corp., D.C.Del., 53 F.Supp. 953, 957: "While fraud must be alleged with particularity * * *, it is only necessary to allege ultimate facts and not evidence." And see Mutual Life Ins. Co. of New York v. Krejci, 7 Cir., 123 F.2d 594, 595; Daniel v. Board of Trade of City of Chicago, 7 Cir., 164 F.2d 815, 820; Kohler v. Jacobs, 5 Cir., 138 F.2d 440, 443.

Defendants cite Judge Rifkind's opinion in Doyle v. Milton, D.C., 73 F.Supp. 281. There Judge Rifkind, at page 285, stated that there were two questions with respect to the proxy statement. The first

he answered by showing that the SEC had filed a memorandum with the court stating that the proxy statement in that respect was not improper. The second question, as stated by Judge Rifkind, was whether a proxy statement is false or misleading which fails to state "that the management's proposal was conceived and planned to perpetuate the management's control of the corporation". In discussing this second question, at page 286, the judge said that the SEC proxy Rule does not require the statement of such a motive. I think this discussion by Judge Rifkind, in that context, has no bearing on question now before us: The undisclosed "motive" or purpose here was that the three principal individual defendants would bail their controlled companies out of a loan made to purchase the controlling stock of Kayser.

The district judge stressed the fact that members of the staff of the SEC—as distinguished from the Commission itself—made no objection to the proxy statement sent to the stockholders here. But those subordinates cannot bind the Commission, and do not speak for it without its approval, not given here. More important, nothing in the record shows that the fact concerning the loan was disclosed to the Commission or its staff.

The district judge also said that plaintiff, if he had inquired, would have learned of the omitted material facts. What of it? If defendants had the obligation to insert the omitted matter in the proxy statement, it is no defense that plaintiff might have learned of that fact dehors the statement.

Accordingly, I think the allegations in Count III with reference to the loans should prevent its dismissal. I agree that the other allegations concerning other matters in the proxy statement do not make out a good cause of action. An order to strike those other allegations would have been proper. But defendants sought no such order and none was entered. Of course, that part of a complaint is defective does not justify dismissing the whole of it.

An economy like ours, which thrives on the fact that thousands of persons of modest means invest in corporate shares, will be poorly served if our courts regard with suspicion all minority stockholders' suits, and, therefore, out of a desire to discourage such suits, apply to them unusually strict pleading rules, thus tending to thwart judicial inquiries into the conduct of wrongdoing, controlling stockholders. The unfortunate consequence will be that those in control may be immunized from effective attacks on their misdeeds, and, as a result, the small investors will lose confidence in all corporate managements, the honest as well as the dishonest.

There is no proof that the present action is a so-called "strike" suit. But, even assuming it is, we should have in mind the following remarks by Professor Simpson of Harvard, in discussing the attitude that all such suits are of that character: "But it has not always been recognized that the litigant with a personal axe to grind may serve a definitely useful purpose. Minority stockholders' suits are often very expensive; the day of the dogged and litigious individual who will bankrupt himself to 'get his rights' seems over; if a Clarence Venner will pay lawyers' and accountants' and engineers' fees in the hope of personal profit, numerous small and impecunious stockholders may sometimes be saved from serious injustice. Such protection to the small stockholders is fortuitous, but it may be better than none. The divorce between corporate ownership and corporate control, now almost complete in many large business units, requires that courts of equity be alert to protect the interests of scattered ownership against personal profit-seeking on the part of those exercising centralized control and that minority owners be encouraged to be active in asserting their rights, as the only alternative to some administrative control by govern-

ment of the internal affairs of large corporations." [18]

Reversed and remanded as to Count V; affirmed as to Counts I, II, III and IV.

BRENNAN, J., concurs as to counts II and V.

### Appendix

Plaintiff's Amended Complaint (omitting the exhibits annexed thereto) reads as follows:

### Amended Complaint

Plaintiff, by Hays, St. John, Abramson & Schulman, his attorneys, as and for his amended complaint against the defendants alleges:

### Count I

1. Plaintiff is a citizen of the Commonwealth of Pennsylvania and defendant, Julius Kayser & Co. (hereinafter called "Kayser"), is a corporation organized and existing under and by virtue of the laws of the State of New York. Upon information and belief the individual defendants are citizens of the State of New York.

2. Plaintiff is, and has been since prior to July 22, 1954, the owner of record of one hundred (100) shares of the capital stock of defendant Kayser, whose ■■■ capital stock is registered on a national securities exchange, to wit, the New York Stock Exchange.

3. This Court has jurisdiction of this cause of action under Section 27 of the Act of Congress of June 6, 1934, entitled "The Securities Exchange Act of 1934", as amended 15 U.S.C.A. § 78aa.

4. Plaintiff brings this cause of action on his own behalf and representatively on behalf of all other stockholders of defendant Kayser; defendant Kayser has outstanding more than 600,000 shares of common stock which are registered and actively traded on the New York Stock Exchange and held by more than 3,000 persons whose residences are widely scattered and whose identity is subject to continuous change by reason of transfer and death; it is therefore impossible to bring all stockholders before the Court. Prosecution of this cause of action by plaintiff fairly insures adequate representation of all stockholders of defendant Kayser.

5. Diamond Hosiery Corporation (hereinafter called "Diamond"), Hamilton Textile Mills, Inc. (hereinafter called "Hamilton Textile") and Hillcrest Factors, Inc. (hereinafter called "Hillcrest") are, upon information and belief, corporations duly organized and existing under and by virtue of the laws of the State of New York; on or about May 13, 1954 each of said corporations ■■■ purchased 10.4% of the outstanding common stock of the defendant Kayser, to wit, 62,442 shares were purchased by Diamond, 62,443 by Hillcrest and 62,442 by Hamilton Textile.

6. Defendants Goldsmith, Feinberg and Hinerfeld are variously officers and directors of defendant Kayser and variously officers, directors and controlling stockholders of Diamond, Hillcrest and Hamilton Textile.

7. Upon information and belief, the stock acquired by Diamond, Hillcrest and Hamilton Textile, as aforesaid, was purchased from LaFrance Industries, Inc., and one of its subsidiaries, and from Paolini Gerli, William T. Golden, Theophil N. Mueller (president of defendant Kayser) and William P. Dunn, Jr.; at the time of said purchase the aforesaid individuals and one R. C. Kramer, chairman of the board of directors of LaFrance Industries, Inc., were directors of defendant Kayser and said Kramer was chairman of the board of directors of said defendant; the price paid by Diamond, Hillcrest and Hamilton Textile for said shares was $16.50 per share.

8. That on or about May 13, 1954 Kramer, Gerli, Golden, Dunn and Clifford W. Michel resigned as directors of defendant Kayser and defendants Goldsmith, Hinerfeld and Feinberg, and Albert P. Parker, Monroe Chapin and P.

---

18. Simpson, Fifty Years of American Equity, 50 Harv.L.Rev. (1936) 171, 190–191.

Stafford Cleary were elected as directors of said corporation; defendants Goldsmith, Hinerfeld and Feinberg dominate and control the board of directors of defendant Kayser and the management of said corporation through their control of Diamond, Hillcrest and Hamilton Textile, which said corporations are the controlling stockholders of defendant Kayser.

9. Prior to July 9, 1954 defendant Kayser, at the instigation and direction of defendants Goldsmith, Feinberg and Hinerfeld, negotiated a contract for the purchase by Kayser of property and assets of Diamond; a copy of said contract, executed as of July 22, 1954, under the direction of the individual defendants and particularly of defendants Goldsmith, Feinberg and Hinerfeld, is annexed to Exhibit A hereto.

10. Prior to July 9, 1954 defendants commenced the preparation of proxy soliciting material for a special meeting of stockholders of defendant Kayser to be held on August 20, 1954; on or about July 22, 1954 defendants distributed to the stockholders of Kayser, through the United States mails, a notice of special meeting of stockholders for August 20, 1954 and a proxy statement (copies of which are annexed hereto as Exhibit A) and a letter signed by defendant Feinberg (a copy of which is annexed hereto as Exhibit B); said special meeting was called for the purpose of approving the purchase by defendant Kayser of property and assets of Diamond as provided in the aforesaid contract.

11. Defendants, their agents and employees, solicited and caused to be solicited by means of said proxy statement, and of other oral and written communications embodying material therein contained, the proxies of stockholders of defendant Kayser for said meeting; and procured thereby proxies from stockholders of defendant Kayser authorizing the voting of shares of stock of said stockholders in favor of the proposed transaction.

12. At the aforesaid special stockholders meeting, on August 20, 1954, said proxies and the shares of stock of Diamond, Hillcrest and Hamilton Textile were voted in favor of said proposed transaction; the total number of shares so being voted in favor thereof constituting, upon information and belief, more than two-thirds of the issued and outstanding stock of defendant Kayser.

13. Upon information and belief, the solicitation of proxies by means of said proxy statement and by means of the aforesaid communications of defendants, their agents and employees, violated Section 14(a) of the Securities Exchange Act of 1934, as amended 15 U.S.C.A. § 78n(a), and Rule X–14a–9 promulgated thereunder.

 14. Upon information and belief, said proxy statement contained statements which at the time and in the light of the circumstances under which they were made, were false or misleading, with respect to material facts; among others, statements contained under the headings: "Summary of Proposals", "Description of Diamond", "Sales Volume and Earnings", "Property", "Effect of Purchase Upon the Company" and "Interest of Directors, Officers and Stockholders of the Company and Associates" (pages 2–6 inclusive of Exhibit A) were false or misleading at the times and in the light of the circumstances under which they were made;

(a) Upon information and belief, said statements were intended by defendants to, and did represent to stockholders that (i) it would be to the advantage and interest of defendant Kayser and its stockholders to acquire said properties and assets of Diamond; (ii) that the same were required by defendant Kayser; (iii) that the same were worth the price to be paid therefor; (iv) that Diamond is a company with a record of profitable operation; (v) that the business of Diamond will contribute to the profitable operation of defendant Kayser; (vi) that it would be to the advantage of Kayser to sell hosiery under the trademark "Fruit Of The Loom" and to sell hosiery to customers of Diamond who resell same under their own trademarks and brand names;

(vii) that the description of the interests of directors, officers and stockholders of defendant Kayser, on page 6 of Exhibit A, was a full description of the direct and indirect interests of said defendants in the transaction; (viii) that the defendant directors, Goldsmith, Feinberg and Hinerfeld, and the controlling stockholders of Kayser, Diamond, Hillcrest and Hamilton Textile, had no personal interest in the proposed transaction nor any motive or purpose in proposing or supporting the same, except the interests of defendant Kayser; whereas

(b) Upon information and belief (i) it would not be to the advantage and interests of Kayser or its stockholders to acquire the aforesaid properties and assets of Diamond; (ii) the acquisition of said properties and assets will benefit defendants Diamond, Hillcrest and Hamilton Textile and defendants Goldsmith, Feinberg and Hinerfeld by permitting Diamond to withdraw from the hosiery business where it operated on a diminishing rate of profit under unfavorable leases; by permitting Hamilton Hosiery Mills, Inc., an affiliate of Hamilton Textile and an associate of defendants Feinberg and Hinerfeld, to procure Kayser, an established and successful company, as lessee of properties owned by said Hamilton Hosiery Mills, Inc., in place of Diamond; by providing funds to Diamond with which to satisfy obligations owed by it to Hamilton Hosiery Mills, Inc.; and by enabling Diamond, Hillcrest and Hamilton Textile to acquire funds with which to pay for the stock of Kayser purchased by them, as aforesaid; (iii) said properties and assets are not required by defendant Kayser; nor is it necessary to deplete the working capital of Kayser to procure such back orders for hosiery as Diamond shall not have been able to fill on the date when the proposed contract is consummated; (iv) said properties and assets are not worth the price to be paid therefor; (v) that Diamond does not have a record of profitable operations or a ratio of profit commensurate with its volume of sales and that its ratio of net earnings to net sales has declined drastically in recent years; (vi) the business of Diamond will not contribute to the profitable operation of defendant Kayser; (vii) a large part of hosiery sold by Diamond is sold under the trademark "Fruit Of The Loom" or is sold to customers who resell same under their own trademarks and trade names; that such sales are not established on a permanent basis since the trademark "Fruit Of The Loom" may be used only during the term of a license agreement therefor and since sales to proprietors of other trademarks and brand names is at the sufferance of such proprietors who may purchase hosiery from innumerable competitors to be sold under such trademarks and brand names; that Diamond has no established trademarks of its own; and (viii) the description of interests on page 6 of Exhibit A is not full or complete.

15. Said proxy statement omitted to state material facts necessary in order to make the statements therein at pages 2–6 thereof, under the headings hereinabove alleged, not false or misleading; among other things, said proxy statement omitted to state (or set forth):

(i) The amount of money borrowed by Diamond, Hillcrest and Hamilton Textile to purchase the stock of Kayser, as aforesaid; the date or dates on which said corporations were required to repay such loans; and the portion of the purchase price to be paid by defendant Kayser to Diamond which will be used by Diamond, Hillcrest or Hamilton Textile respectively to repay such loans made by them for the purpose of acquiring the stock of defendant Kayser.

(ii) The purchase price paid by Diamond, Hillcrest and Hamilton Textile for the stock of Kayser on or about May 13, 1954; that said purchase price was higher than the market price of said stock; that the said stock was purchased from directors of said corporation or from corporations whose directors were also directors of defendant Kayser, and that said directors or directors of corporate stockholders of Kayser resigned from the board of directors of Kayser

on or about the date when Diamond, Hillcrest and Hamilton Textile purchased said stock.

(iii) That defendants Goldsmith, Hinerfeld and Feinberg, and Parker, Chapin and Cleary were elected directors of the corporation, by other directors, on or about May 13, 1954.

(iv) That defendant Feinberg had been chairman of the board of directors of Diamond, whether or not he occupied that position on or about July 22, 1954, that he was a director of Diamond on or about said date, the amount of stock of Diamond owned on said date by defendant Feinberg and corporations controlled by him.

(v) Whether or not there had been any discussion or decision by directors of Diamond or of defendant Kayser concerning the renewal of leases between Hamilton Hosiery Mills, Inc. and Diamond.

(vi) The ratio of net earnings to net sales of Diamond for the four months ended June 30, 1954 or other information permitting a determination as to the rate or amount of profit to be derived from said sales.

(vii) The names of the officers of defendant Kayser who inspected Diamond's properties and reported that said properties were in excellent condition and should be acquired by Kayser.

(viii) The results of independent valuations of the assets of Diamond which are to be acquired under the proposed agreement; ▆▆ or the separate valuation of Diamond's land, buildings and equipment.

(ix) Information as to Kayser's need for additional buildings or floor space for its present or additional manufacturing equipment.

(x) What proportion of Diamond's backlog of hosiery orders is for full-fashioned hosiery and what proportion is for seamless hosiery.

(xi) The proportion of the projected combined hosiery sales of defendant Kayser and Diamond which will be seamless hosiery and the proportion of full-fashioned hosiery.

(xii) The amount of full-fashioned hosiery which could be manufactured on the equipment presently owned by defendant Kayser.

(xiii) The cost of acquiring machinery for the manufacture of full-fashioned hosiery from sources other than Diamond.

(xiv) The age of machinery to be acquired by defendant Kayser from Diamoned by outright transfer of title or by the assumption of leases therefor.

(xv) The possible rental, or rate thereof, payable under a lease between Hamilton Hosiery Mills, Inc. and Diamond, or the amount of production which will be channeled to the facilities covered by said lease, under which said rental is computed on a production basis.

(xvi) The amount of hosiery inventory held by Kayser, the amounts of full-fashioned and seamless hosiery included in the combined inventory of Diamond and defendant Kayser and whether the cost of full-fashioned hosiery to be acquired from Diamond is lower than the cost of manufacturing same on Kayser's machinery.

(xvii) Why the agreement of sale is terminable upon the death of defendant Goldsmith.

(xviii) Whether or not, in opinion of defendants' counsel, the proposed transaction violates Section 7 of the Clayton Anti-Trust Act, 15 U.S.C.A. § 18.

▆▆ (xix) Current, complete and audited financial statements of Diamond; nor statements reflecting the stock of Kayser, owned by Diamond, as an asset, or indicating as a liability any indebtedness incurred in the purchase thereof.

(xx) Complete or audited financial statements of Kayser.

(xxi) A pro forma balance sheet or other information indicating to the stockholders the condition of defendant Kayser in the event that the purchase be consummated and particularly the effect of said purchase upon the cash and working capital of said defendant.

(xxii) Salary to be paid to defendant Goldsmith by defendant Kayser.

16. Upon information and belief, defendants and Diamond, Hillcrest and Hamilton Textile knew of the respects in which the aforesaid statements were false and misleading and knew of the aforesaid omissions of material facts necessary to make statements in the proxy statement not false or misleading, all as hereinbefore alleged. Defendants and Diamond, Hillcrest and Hamilton Textile prepared and caused said proxy statement to be prepared in the manner in which it was distributed to the stockholders of defendant Kayser, as aforesaid, in order to procure from said stockholders approval of the transaction, proxies in favor of said transaction and the votes of such stockholders as attended the meeting personally, in favor of said transaction.

17. Upon information and belief, said proxy statement was read by stockholders of defendant Kayser who were misled thereby and were thereby induced to grant their proxies in favor of affirmance of the proposed transaction at the aforesaid stockholders meeting and to vote in favor thereof at said meeting.

18. By reason of the foregoing, the opportunity of stockholders of defendant Kayser, including plaintiff, to properly evaluate the proposed sale and to reach an informed and sound decision with respect thereto was thereby impaired and denied; plaintiff has no adequate remedy at law.

## Count II

19. Plaintiff repeats and realleges, as part of this cause of action, each and all of the allegations contained in paragraphs 1 to 18 inclusive of this amended complaint, with like effect as if herein fully repeated.

20. The aforesaid contract for the sale of assets and properties of Diamond to defendant Kayser, the approval thereof by stockholders of defendant Kayser, and the consummation thereof, and the transfer of said properties and assets and the payment therefor violate and will violate Section 29 of the Securities Exchange Act of 1934, as amended 15 U.S. C.A. § 78cc; said acts depend upon and are, or will be, the result of the circulation of the aforesaid proxy statement (Exhibit A) in the United States mails, and the solicitation of proxies thereby, and the solicitation of proxies by means of oral or written communications by defendant, its agents or employees, embodying statements therein contained, all of which are in violation of Section 14 of the Securities Exchange Act of 1934, as amended, and Rule X–14a–9, as hereinbefore alleged.

## Count III

21. Plaintiff repeats and realleges, as part of this cause of action, each and all of the allegations contained in paragraphs 1–3 and 5–18 inclusive of this amended complaint, with like effect as if herein fully repeated.

22. Plaintiff brings this cause of action on behalf of himself and all other stockholders of defendant Kayser similarly situated.

23. Plaintiff is and was an owner of one hundred (100) shares of the capital stock of defendant Kayser on and prior to July 22, 1954.

24. This action is not a collusive one to confer on a court of the United States jurisdiction of any action of which it would not otherwise have jurisdiction.

25. Demand by plaintiff upon the board of directors of defendant Kayser and upon the defendants who are members thereof, to bring this cause of action was not made, and would have been futile because a majority of the members of said board of directors consist of the individual defendants herein; said board of directors is dominated by defendants Goldsmith, Feinberg and Hinerfeld, as hereinbefore alleged; defendants Goldsmith, Feinberg and Hinerfeld and Diamond, Hillcrest and Hamilton Textile, controlling stockholders of defendant Kayser, have an interest in the performance of said contract and the bringing of this cause of action would be adverse to such interests; attorneys

for said defendants have contended that the proposed transaction and all actions taken by defendants with respect thereto, with respect to which complaint is made in this cause of action and the causes hereinabove alleged, are completely proper, lawful, in the best interests of Kayser and in compliance with Sections 14 and 29 of the Securities Exchange Act of 1934, as amended; that said defendant directors would not diligently prosecute this cause of action since they would in effect be required to bring it against themselves.

26. Defendant Kayser has no adequate remedy at law.

## Count IV

27. Plaintiff repeats and realleges as part of this cause of action each and all of the allegations contained in paragraphs 1–3 inclusive, 5–18 inclusive, 20, and 22–26 inclusive of this amended complaint, with like effect as if herein fully repeated.

28. By reason of the foregoing, defendant Kayser has been and will be irreparably damaged unless the proposed purchase by it of assets and property of Diamond, as aforesaid, is enjoined, in that the said purchase would constitute an improper and wasteful expenditure of its funds, would be detrimental and injurious to it, and would be solely for the benefit of defendants Goldsmith, Hinerfeld, Feinberg and Diamond, Hillcrest and Hamilton Textile; as is more fully alleged in paragraph 14(b) hereof.

## Count V

29. Plaintiff repeats and realleges as part of this cause of action each and all of the allegations contained in paragraphs 1, 2, 5–9 inclusive, 22, 23–26 inclusive and 28 of this amended complaint, with like effect as if herein fully repeated.

30. The amount in controversy exceeds, exclusive of interest and costs, the sum of $3,000.00.

Wherefore, plaintiff prays judgment

(a) (i) Enjoining the individual defendants and defendant Kayser, its directors, officers and agents, from performing the aforesaid contract for the purchase of assets and properties of Diamond or from consummating said purchase;

(ii) Declaring said contract void and unenforceable;

Or, if said contract is performed before hearing and determination of this action:

(iii) Directing the individual defendants, defendant Kayser, its directors, officers and agents, to restore to Kayser any moneys paid to Diamond, to set aside any instruments or agreements whereby Kayser assumed liabilities of Diamond, and to restore to Diamond any assets or properties transferred to Kayser.

(b) For the costs and disbursements of this action, including counsel fees; and

(c) For such other and further relief as may be just and proper.

MEDINA, Circuit Judge (dissenting in part).

In this case we are split three ways. Judge Frank holds for affirmance of the dismissal of Counts I and II and for reversal and remand as to Counts III, IV and V. I would affirm the dismissal of all Counts; and Judge Brennan goes with Judge Frank as to Count V and with me as to Counts III and IV. We all agree that Counts I and II were properly dismissed. The upshot is that we affirm Judge Walsh's order dismissing Counts I, II, III and IV and reverse so much of his order as dismisses Count V, with remand for further proceedings in due course as to that Count. Except for the portion of this opinion which concerns the dismissal of Count V on motion for summary judgment, what I have to say represents the views of Judge Brennan and myself.

## Counts I, II, III and IV

On July 22, 1954, an agreement was made between Julius Kayser & Co. and Diamond Hosiery Corp. by the terms of which Kayser was to purchase Diamond as a going business. In substance the

agreement contemplated the merger of an old established firm with a rapidly expanding new one. There were included in the agreement elaborate provisions for the scheduling and transfer of numerous parcels of real property, leases, patents and patent. applications, trade-marks, trade-names and applications therefor; raw materials and supplies required the taking of a special inventory; numerous adjustments were provided for with respect to prepaid insurance, wages and salaries, including accrued vacation pay, taxes, rents, mortgage interest, prepaid advertising and promotion expense and similar matters; the agreement provided that unless a majority of the stockholders approved on or before September 15, 1954, either party had the option to cancel and terminate the transaction; the seller warranted that the net worth at the date of closing "will be not less than $900,-000;" and the purchaser, in addition to the various amounts found to be due on inventory, adjustments and so on, was to pay cash in the amount of $353,051 and assume an unpaid principal balance of $389,500 on a certain mortgage indebtedness; Kayser was not to be burdened with other miscellaneous obligations. The stockholders' meeting was scheduled for August 20, 1954. Plaintiff, a competitor of Kayser, acquired his 100 shares of Kayser stock one week before the announcement of the merger agreement; and he brought this action a few days before the meeting, unsuccessfully applying for an injunction to prevent the consummation of the merger.

The amended complaint, for reasons which are far from clear, is divided into five Counts, the last four of which repeat and reallege in a bewildering manner certain selected paragraphs and groups of paragraphs of the first and other Counts. It is not even clear whether all, or only a few, or perhaps one, of the Counts are derivative. This devious method of approach is probably due to difficulties relating to jurisdiction or perhaps to the security provisions of Section 61-b of the New York General Corporation Law; but we shall not concern ourselves with such reasons as may lie behind this seemingly needless confusion. The substance of the first four Counts is the charge that the Proxy Statement sent out prior to the stockholders' meeting contained false and misleading statements, contrary to the requirements of SEC Rule X–14A–9, from which plaintiff spells out a substantive right to sue, relying on Sections 14(a) and 29(b) of the Securities Act. It is claimed that the fact that the Proxy Statement was prepared in consultation with the staff of the SEC, and in full compliance with the SEC Rules and Regulations as interpreted by the staff, is of no moment, as the Commission gave no formal approval nor was any adjudication made as to the sufficiency of the Statement and we agree that such participation in the preparation of the Proxy Statement by staff members of the SEC as may have taken place cannot affect the sufficiency as matter of law of the allegations of the complaint.

*In limine* it is at least doubtful that it was the intention of the Congress to create any substantive rights by the provisions of Sections 14(a) and 29(b) of the Security Act. We do not think the authorities cited in support of plaintiff's position on this point do more than affect supposedly analogous situations. We need not reach that point, however, as the allegations contained in the first four Counts are insufficient to state a claim for relief, even if it be assumed that the inclusion of false and misleading statements in the Proxy Statement would constitute a sufficient basis for enjoining the consummation of an otherwise proper and legal agreement of purchase and sale or the undoing of one already carried out.

The Proxy Statement is lengthy and sets forth in elaborate detail the terms of the proposal, including a copy of the agreement of purchase and sale, elaborate descriptions of the properties involved, the nature of the business of the two companies and the anticipated effect of the merger, supplemented by vari-

ous financial statements, with explanatory notes. The business of Diamond is to be taken over as a going concern with its key employees, including A. Philip Goldsmith, its president and general manager. Under the title "Interest of Directors, Officers and Stockholders of the Company and Associates," the Proxy Statement discloses the interests of A. Philip Goldsmith, who with associates, owns 75% of the stock of Diamond, and those of Abraham Feinberg and Benjamin Hinerfeld, owners of a majority of the stock of Hillcrest Factors, Inc. and Hamilton Textile Mills, Inc. It therein appears that Diamond, Hillcrest and Hamilton each owns 62,442 or 62,443 or 10.4% of the stock of Kayser and that Goldsmith, Feinberg and Hinerfeld are directors of Kayser. It further appears that Hamilton and Feinberg and Hinerfeld are associates of the Hamilton lease to Diamond and that the large stockholdings above described were acquired on May 13, 1954.

The amended complaint alleges the purchase of the respective amounts of common stock of Kayser on May 13, 1954, by Diamond, Hillcrest and Hamilton Textile, that Goldsmith, Feinberg and Hinerfeld are "variously officers and directors of defendant Kayser and variously officers, directors and controlling stockholders of Diamond, Hillcrest and Hamilton Textile;" and that "defendants Goldsmith, Hinerfeld and Feinberg dominate and control the board of directors of defendant Kayser and the management of said corporation through their control of Diamond, Hillcrest and Hamilton Textile, which said corporations are the controlling stockholders of defendant Kayser." This conflict of interest is substantially disclosed in the Proxy Statement, except for the characterization of control, which may be inferred from the ownership of the three blocks of 10.4% each of the Kayser stock.

Rule X–14A–9 prohibits solicitation by means of any proxy statement "containing any statement which, at the time and in the light of the circumstances under which it was made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false and misleading." Accordingly, the amended complaint purports to set forth a series of allegedly false statements and a series of alleged omissions.

The so-called false statements turn out to be nothing of the kind. Thus paragraph 14 of the amended complaint has a long, involved preliminary sentence which, when read carelessly, appears to charge that certain specified statements of fact in the Proxy Statement are false. But this is merely an impression; there is no such enumeration. The preliminary sentence does allege that the Proxy Statement "contained statements" which "were false and misleading," and it continues "among others, statements contained under" certain headings such as "Summary of Proposals," "Description of Diamond" and so on. But the subdivision (a), which immediately follows, merely states that "said statements," without specifying them, were intended to represent "that (i) it would be to the advantage and interest of Kayser and its stockholders to acquire said properties and assets of Diamond," with more to the same effect. The whole paragraph is no more than a series of conclusory characterizations. Not a single specific part of the Proxy Statement is identified and alleged to be false. A similar paragraph might be contrived by an artful and ingenious pleader who knew nothing of the facts and had good and sufficient reasons for not taking the responsibility of making a serious charge as to any specific supposedly false statement, for fear of the consequences, should it develop that such specific statement was absolutely true.

The long enumeration of a host of alleged omissions in paragraph 15 of the amended complaint again boils down to nothing at all. Most of these alleged omissions are bits of miscellaneous information which plaintiff's knowledge of the business as a competitor appears to have made it possible for him to think

up, although a Proxy Statement containing such a mass of detail would likely confuse more than help a stockholder. Thus information is said to have been omitted, such as the names of the Kayser officers who inspected Diamond's properties and reported thereon, the proportion of Diamond's backlog of hosiery orders for full-fashioned hosiery and for seamless hosiery, the ratio of net earnings to net sales of Diamond for the four months ended June 30, 1954, the age of the machinery to be acquired by Kayser from Diamond (despite the description in the Proxy Statement of Diamond's "completely modern hosiery manufacturing plant"), and the reason why the agreement provided for cancellation of the agreement if Goldsmith died before a certain date.

The alleged omission which is principally relied upon is supposed to be "the amount of money borrowed by Diamond, Hillcrest and Hamilton Textile to purchase the stock of Kayser, as aforesaid; the date or dates on which said corporations were required to repay such loans; and the portion of the purchase price to be paid by defendant Kayser to Diamond which will be used by Diamond, Hillcrest or Hamilton Textile respectively to repay such loans made by them for the purpose of acquiring the stock of defendant Kayser." But nowhere in the amended complaint is it alleged that any such loans were made.

Judge Walsh properly held these allegations to be insufficient in law on their face. Otherwise a speculator or competitor interested in muddying the waters could attack any substantial proposed corporate transaction, without knowing anything about it, and harass the officers and directors of the contracting parties indefinitely with the taking of depositions and demands for the production of documents and admissions, and the answering of interrogatories.

### Count V

This brings us to Count V which reads:

"29. Plaintiff repeats and realleges as part of this cause of action each and all of the allegations contained in paragraphs 1, 2, 5–9 inclusive, 22, 23–26 inclusive and 28 of this amended complaint, with like effect as if herein fully repeated.

30. The amount in controversy exceeds, exclusive of interest and costs, the sum of $3,000.00."

This Count incorporates by reference: diversity of citizenship (1); plaintiff's ownership of 100 shares of Kayser stock (2); the purchase of Kayser stock by Diamond, Hillcrest and Hamilton Textile, the alleged control and conflicting interests of Goldsmith, Hinerfeld and Feinberg, a charge that the agreement was negotiated by Kayser "at the instigation and direction of" Goldsmith, Hinerfeld and Feinberg (5–9); an allegation that plaintiff brings the action "on behalf of himself and all other stockholders of defendant Kayser similarly situated" (22); allegations that a demand upon the Board of Directors to bring the suit would be futile in view of the control and the interest of Goldsmith, Hinerfeld and Feinberg, that the action is not collusive, that plaintiff has no adequate remedy at law (23–26); and an allegation that "said purchase would constitute an improper and wasteful expenditure of its funds, would be detrimental and injurious to it, and would be solely for the benefit of defendants Goldsmith, Hinerfeld, Feinberg and Diamond, Hillcrest and Hamilton Textile," (28).

This is the Count which was disposed of on the merits by the granting of defendants' motion for summary judgment.

Perhaps the most significant feature of the papers submitted in support of and in opposition to the motion for summary judgment is the complete failure of plaintiff to present any proofs whatever to establish his charges. The affidavit of counsel is no more than an argumentative memorandum. And so the proofs submitted in support of the motion remain unanswered.

The affidavits filed by defendants include one by the lawyer who prepared

the Proxy Statement and who conducted the conferences with the SEC staff, one by the accountant who assisted at these conferences and another by Abraham Feinberg, a director and Chairman of the Board of Kayser. The details, including letters' passing between counsel and the Assistant Director of the Division of Corporate Finance of the SEC, appearing in the affidavit of Emanuel Klimpl, demonstrate the scrupulous care with which the Proxy Statement was prepared. There was full disclosure of the conflict of interest upon which plaintiff relies so confidently; many of the supposed omissions were due to specific Regulations stating that such information was unnecessary; others were found upon consultation to be of little or no importance.

The Feinberg affidavit establishes in the most convincing manner that the purchase, far from constituting "an improper and wasteful expenditure" of the Kayser funds, and "detrimental and injurious to it," and "solely for the benefit of" Goldsmith and the other defendants, was in every way advantageous to Kayser, whose "business had steadily fallen off from an annual volume of $6,500,000 for the year 1949 to approximately $3,500,000 for the year ended June 30, 1954." The Kayser Hosiery Division had been operating at a loss. On the other hand, under the guidance of Goldsmith, who, by the way, stood to lose the most if the new set-up failed to live up to expectations, Diamond, with a modern, efficient, up-to-date plant and an aggressive and successful sales organization, had been making rapid strides ahead, in the face of a contrary trend in the industry as a whole.

Thus some of the advantages and benefits to Kayser were thus catalogued by Feinberg:

"The addition of Diamond's $9,000,000 volume of business will result in a 50% increase in the gross volume of business done by Kayser.

"The addition of the Diamond business will treble Kayser's volume of hosiery business. Kayser will have as the active head of its Hosiery Division one of the most successful, outstanding figures in the industry.

"Kayser will acquire a topnotch merchandising and selling organization with which the Kayser hosiery staff can be integrated.

"Kayser hosiery products, now in the higher price lines under its 'Kayser' and its 'Christian Dior' brand names, will have added to them the Diamond 'Fruit of the Loom' and 'Custom-Pack' lines, which are in the lower, popular price ranges, resulting in a well rounded line in the branded and private label field.

"On the basis of current operations of both companies, I have conservatively estimated that the absorption of the Diamond business into Kayser will make possible savings in factoring costs, overhead and finishing costs which, added to the Diamond current earnings, will add a minimum of $700,000 to Kayser's annual earnings, before taxes. This figure should go higher when overlapping in the two organizations is eliminated and when, as we are confident they will, the 'Kayser' and 'Christian Dior' brand name sales increase.

"Along with a merchandise inventory consisting of newly manufactured hosiery, at the lower of cost or market value, we get the benefit of approximately $500,000 of unfilled Diamond orders."

If it be said that no appraisals of independent experts were submitted to prove that the value of the assets and properties purchased, including good will, were in excess of the purchase price, it is a sufficient answer to point out that

the allegation in the original complaint that the amount paid was "in excess of the fair and reasonable value of such assets and properties" was omitted from the amended complaint. Moreover, under the circumstances and in the absence of any evidence whatever to the contrary, no such affidavits were required in any event. Nor was it necessary that defendants produce affidavits of each of the directors to the effect that they gave the matter independent consideration and voted approval of the transaction because they were convinced that it was a good purchase for a fair price in Kayser's interest.

The nub of the charge in Count V is not that the directors acted in bad faith or that their votes did not represent their true views concerning the business advantages to Kayser, but that the "purchase would constitute an improper and wasteful expenditure of its funds, would be detrimental and injurious to it" and would be solely for the benefit of Goldsmith, Hinerfeld, Feinberg and their companies. Surely it cannot be the law that the purchase of a few shares of stock just prior to the consummation of a merger or similar corporate transaction of purchase and sale, involving large sums of money, can put the purchaser in a position to make charges of wasteful and improper expenditure of funds, leave such charges wholly unsubstantiated when defendants move on proper proofs for summary judgment, and then proceed to take advantage of the discovery procedures provided in the Federal Rules of Civil Procedure. Especially is this so, when, as pointed out in Judge Walsh's opinion below, the purchaser is a competitor.

For these reasons I would affirm Judge Walsh's order in its entirety, and I dissent from so much of the determination of this court as reverses and remands with respect to Count V of the complaint.

BRENNAN, J., concurs as to counts I, II, III and IV.